**STORCH AMINI & MUNVES PC**
2 Grand Central Tower, 25th Floor
140 East 45th Street
New York, New York 10017
Telephone: (212) 490-4100
Bijan Amini, Esq.
Avery Samet, Esq.
*Special Counsel for Lori Lapin Jones, as Chapter 11 Trustee*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| PENINSULA HOSPITAL CENTER, et al., | : | Case No. 11-47056 (ESS) |
| | : | Case No. 11-47985 (ESS) |
| | : | |
| Debtors. | : | |

-----------------------------------------------------------------------x

| | |
|---|---|
| LORI LAPIN JONES, Chapter 11 Trustee of the Estates of | : |
| Peninsula Hospital Center and Peninsula General | : |
| Nursing Home Corp., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| STEVEN ZAKHEIM a/k/a SHLOMO ZAKHEIM, | : |
| SUZANNE FAYE ZAKHEIM, TODD MILLER, | : |
| SAMUEL A. WEISS a/k/a ARI WEISS, ISAAC SOSKIN, | : |
| REVIVAL FUNDING CO. LLC, REVIVAL | : |
| ACQUISITION GROUP LLC, GAMZEL, NY, INC. | : |
| d/b/a REVIVAL HOME HEALTH CARE, | : |
| METROPOLITAN HOME HEALTH PRODUCTS, | : |
| INC. d/b/a METROSTAR, GAMZEL LLC, SENIOR | : |
| SCRIPT PHARMACY LLC, REVIVAL PHARMACY | : |
| LLC, and NAE EDISON, LLC d/b/a EDISON HOME | : |
| HEALTH CARE, | : |
| | : |
| Defendants. | : |

**COMPLAINT**

-----------------------------------------------------------------------x

# TABLE OF CONTENTS

Preliminary Statement........................................................................................................1

Jurisdiction and Venue......................................................................................................3

The Parties .......................................................................................................................4

The Plaintiff .....................................................................................................................4

The Defendants .................................................................................................................4

    A.  The Individual Defendants...................................................................................4

    B.  The Corporate Defendants ...................................................................................5

    C.  Non-Defendant Members of the Enterprise ..........................................................7

        A.  Individual Members ........................................................................................7

        B.  Corporate Members ........................................................................................7

            1.  Entities Associated With 5350 Kings Highway.........................................7

            2.  Entities Associated With 5811 Foster Avenue ..........................................9

            3.  Other Entities Related to Ari Weiss......................................................10

Allegations Applicable to All Claims for Relief................................................................10

I.      Background ................................................................................................10

    A.  The Debtors......................................................................................................10

    B.  The Debtors' Bankruptcy Cases .........................................................................10

II.     The RICO Enterprise Controlled by Steven Zakheim ......................................14

    A.  The Health Care Empire Controlled By Steven Zakheim Constitutes a RICO
        Enterprise ........................................................................................................14

        1.  The Structure of the Enterprise ...........................................................14

        2.  The Enterprise Engages in Interstate Commerce....................................17

3.   The Enterprise Engaged and Generally Engages in a Pattern of Racketeering .....17

  (a)  Predicate Acts in Connection with Revival HHC – 2005 through the
    Present Day ........................................................................................17

    (i)  Mail and Wire Fraud in Connection with Billing Medicare
      and Medicaid.........................................................................19

    (ii)  Steven Zakheim Operates Revival HHC in Defiance
      of the Affidavits ...................................................................20

  (b) The Fraudulent Scheme to Acquire and Integrate the Debtors
    Into the Enterprise ............................................................................21

III. Steven Zakheim Controlled the Debtors............................................................24

 A.  Steven Zakheim Installed Todd Miller at the Debtors..................................24

 B.  Steven Zakheim Acted as the Chief Executive of the Debtors .....................26

  1.   Steven Zakheim Worked Out of the Debtors' Executive Suites and
    Emergency Room......................................................................................26

  2.   Steven Zakheim Involved Himself in Major Decisions of the Debtors.................26

  3.   Zakheim Received Daily Reports Concerning the Operations of the
    Debtors....................................................................................................27

  4.   Zakheim Conducted the Hiring of the Debtors' Senior Management ..................28

IV. Zakheim and Miller Operated the Debtors for the Benefit of Zakheim and
  His Enterprise.......................................................................................................29

 A.  Directing Patients to Utilize Revival HHC and MetroStar ....................................29

 B.  Directing Lucrative Business Deals and Transfers to Enterprise Businesses
  and Other Associates of Steven Zakheim ............................................................30

  1.   Purchasing...............................................................................................30

  2.   Undisclosed Benefits to the Enterprise ...........................................................32

  3.   Transfers to the Zakheim Enterprise or Business
    Associates of Steven Zakheim ......................................................................33

    4.   Zakheim and Miller Caused the Debtors to Needlessly Spend Money to Hide Zakheim's Involvement ....................................................................33

V.    Miller Sabotaged Efforts to Obtain Alternative Sources of Financing to Protect Zakheim's Interests ..........................................................................................34

VI.    Miller, with Zakheim's Knowledge, Made Fraudulent Statements to the DOH to Obtain Approval for the DIP Loan..........................................................35

VII.    False, Misleading and Incomplete Statements to the Bankruptcy Court Hid Zakheim's Takeover ...................................................................................37

    1.   Misleading Statements Made in Soskin's "Lar-Dan" Affidavit ...................................37

        (a) The Fabricated Loan ...............................................................................38

        (b) The Relationship Between Revival Acquisition, Abrams Fensterman and Alvarez & Marsal Was Not "Common Practice in Such Lending".....................39

    2.   Misleading Statements in the First Day Declaration ...................................39

        (a) Corporate Structure and Management ...................................................40

        (b) Savings and Efficiencies in Purchasing Procedures and Vendor Relationships..........................................................................................40

        (c) Payments and Proposed Payments to Todd Miller ................................41

    3.   Misleading Statements in Miller's Employment Declaration.....................................41

        (a) Miller's Misleading Description of His Relationship with Revival HHC............42

           (i)  Miller Continued to Be Employed and to Work for Revival HHC ................42

           (ii) Miller's Disclosure of Receiving "Some Benefits" from Revival HHC Was Materially Misleading..............................................................................43

           (iii)Miller Falsely Asserted that He Had No Connection with Other Creditors or Parties in Interest ........................................................................44

    4.   Misleading Statements in Miller's Amended Employment Declaration ....................45

    5.   Misleading Statements in the Revival DIP Statement .................................46

    6.   Misleading Statements in Miller's DIP Declaration...................................48

7.  The Kaminski Employment Declaration ...................................................49

(a) Kaminski Did Not Disclose that Zakheim Had Paid Him a $10,000 Bonus Through Revival HHC ...................................................................49

(b) Kaminski Failed to Disclose That Zakheim Gave Him His Credit Card to Use for Expenses ..............................................................50

(c) Kaminski Misrepresented that He Would be Employed by the Debtors, When in Fact the Debtors Were Contracting with an Affiliated Company for his Services .......................................................................51

VIII.    Steven Zakheim, Todd Miller and Revival Funding Coordinate to Mislead the Examiner ..................................................................51

IX.    Miller's Incompetency as a Hospital CEO Led to the Closure of PHC .......................52

The Claims ...................................................................................57

FIRST CLAIM FOR RELIEF ...................................................................57

RICO Section 1962(b)
(Against Steven Zakheim) ...................................................................57

SECOND CLAIM FOR RELIEF ...................................................................59

RICO SECTION 1962(c)
(Against Steven Zakheim and Isaac Soskin) ...................................................59

THIRD CLAIM FOR RELIEF ...................................................................61

RICO Section 1962(d)
(Against Steven Zakheim, Faye Zakheim, Todd Miller, Isaac Soskin, Ari Weiss, Revival Funding, Revival Acquisition, Revival HHC, MetroStar and Ganzel LLC) ...............................61

FOURTH CLAIM FOR RELIEF ...................................................................63

Fraud on the Court
(Against Steven Zakheim, Todd Miller, Isaac Soskin, Revival Funding, Revival Acquisition and Revival HHC) ...................................................63

FIFTH CLAIM FOR RELIEF ...................................................................65

Vacatur of Final DIP Order Pursuant to Rule 60(d)(1)
(Against Steven Zakheim, Todd Miller, Isaac Soskin, Revival Funding, Revival Acquisition and Revival HHC) ...................................................65

SIXTH CLAIM FOR RELIEF..................................................................................................66

Fraud on the Debtors and the Debtors' Estates
(Against Steven Zakheim, Faye Zakheim, Todd Miller, Isaac Soskin, Revival Funding,
Revival Acquisition and Revival HHC) ...........................................................................66

SEVENTH CLAIM FOR RELIEF .........................................................................................67

Fraudulent Concealment
(Against Steven Zakheim, Faye Zakheim, Isaac Soskin, Todd Miller and Revival Funding) ......67

EIGHTH CLAIM FOR RELIEF .............................................................................................69

Equitable Subordination of All Claims Asserted by Revival Funding
(Against Revival Funding).................................................................................................69

NINTH CLAIM FOR RELIEF................................................................................................70

Breach of Fiduciary Duty of Care Owed to the Debtors and to the Debtors' Estates
(Against Todd Miller)........................................................................................................70

TENTH CLAIM FOR RELIEF ...............................................................................................71

Breach of the Duty of Loyalty and Good Faith Owed to the Debtors
and to the Debtors' Estates
(Against Todd Miller)........................................................................................................71

ELEVENTH CLAIM FOR RELIEF ........................................................................................73

Aiding and Abetting Breach of Fiduciary Duty
(Against Steven Zakheim and Ari Weiss) ......................................................................73

TWELFTH CLAIM FOR RELIEF..........................................................................................74

Negligent Hiring, Retention and Supervision of Todd Miller
(Against Steven Zakheim, Faye Zakheim, Isaac Soskin, Revival HHC, Revival Funding
and Revival Acquisition) ..................................................................................................74

THIRTEENTH CLAIM FOR RELIEF ...................................................................................76

Respondeat Superior
(Against Steven Zakheim, Faye Zakheim, Isaac Soskin, Revival HHC, Revival Funding
and Revival Acquisition) ..................................................................................................76

FOURTEENTH CLAIM FOR RELIEF ...................................................................................77

Unauthorized Post-Petition Transfers
(Against Steven Zakheim, MetroStar, Revival HHC, Revival Funding,
Senior Script and Revival Pharmacy LLC) ................................................................................77

FIFTEENTH CLAIM FOR RELIEF ...........................................................................................79

Objection to Claims, Liens and Security Interests Asserted by Revival Funding
(Against Revival Funding)..........................................................................................................79

SIXTEENTH CLAIM FOR RELIEF ...........................................................................................80

Fraudulent Transfer Under the Bankruptcy Code of Security Interest in PGN
(Against Revival Funding)..........................................................................................................80

SEVENTEENTH CLAIM FOR RELIEF.....................................................................................80

Unjust Enrichment
(Against Steven Zakheim, Faye Zakheim, Todd Miller, Isaac Soskin, Ari Weiss,
Edison HHC, Revival HHC, MetroStar, Senior Script and Revival Pharmacy LLC)..................80

EIGHTEENTH CLAIM FOR RELIEF .......................................................................................81

N.Y. Gen. Business Law § 349(h)
(All Defendants)..........................................................................................................................81

Lori Lapin Jones, as the Chapter 11 trustee (the "Trustee") of Peninsula Hospital Center and Peninsula General Nursing Home Corp. (the "Debtors), by her attorneys Storch Amini & Munves PC, for her complaint, alleges as follows:

**Preliminary Statement**

1.        This action arises from Steven Zakheim's illegal scheme to acquire the Debtors and integrate them into his health care empire.  For many years, Zakheim has owned or controlled multiple companies engaged in health care.  In 2005, Steven Zakheim learned that the New York State Department of Health would not approve a Certificate of Need for Revival Home Health Care, a home health care agency he wanted to acquire, if Steven Zakheim had any involvement.  Thus, to obtain the Certificate of Need, Steven Zakheim and his wife Faye Zakheim submitted two affidavits to the New York State Department of Health that represented that Steven Zakheim would not have any direct or indirect involvement in that business.  In fact, those affidavits were false.

2.        In 2011, Steven Zakheim saw an opportunity to acquire control over the Debtors and to integrate them into his health care empire.  However, believing that the New York State Department of Health would not approve such a transaction if he was involved, he set about acquiring control with the assistance of Faye Zakheim and Isaac Soskin under false pretenses.

3.        Thus, Steven Zakheim caused two entities to be formed to serve as the face of the secured lender and acquirer, Revival Funding Co. LLC and Revival Acquisition Group LLC.  To mask Steven Zakheim's involvement, Faye Zakheim became the sole member of both these entities, and Isaac Soskin the principal executive of each.  Nevertheless, both entities were completely controlled by Steven Zakheim.  Through these companies' loans to the Debtors during these Chapter 11 cases, Zakheim, as the true principal of the secured lender, controlled

1

the Debtors.  He also did so by appointing Todd Miller as the Debtors' putative chief executive officer, even while Todd Miller was at all times reporting to Steven Zakheim and protecting his interests.

4.     The misdeeds uncovered by the Trustee in her investigation include, but are not limited to,

- The false and misleading declarations filed with the Bankruptcy Court;

- The false and misleading representation made to the New York State Department of Health to obtain their required consent for the debtor-in-possession financing extended to the Debtors;

- The Debtors' chief executive officer turning over his paychecks from the Debtors for deposit into Steven Zakheim's and Revival Home Health Care's bank accounts;

- The continued payment by Revival Home Health Care to the Debtors' chief executive officer;

- The almost daily reporting by the Debtors' chief executive officer to Steven Zakheim regarding the affairs of the Debtors;

- The regular disclosure of patient information to Steven Zakheim so that he could obtain business from resident discharges;

- The steering of business opportunities to Steven Zakheim's or his relatives' businesses; and

- The payment on the eve of bankruptcy to one of Steven Zakheim's businesses, even though no invoices had been submitted and no payment was due.

2

5.     By this complaint, the Trustee seeks to redress these wrongs through multiple causes of action that seek (a) damages against Steven Zakheim and others acting in concert with him, (b) to recover transfers made to Steven Zakheim and related entities and (c) to subordinate or expunge all claims asserted by the Revival entities, for the benefit of the Debtors' estates and their creditors.

### Jurisdiction and Venue

6.     The United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 because this action arises in or relates to a case under title 11 of the United States Code (the "Bankruptcy Code").  The Bankruptcy Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this action arises under the laws of the Unites States.  In addition, the Bankruptcy Court has jurisdiction over this matter because it implicates the inherent authority of the Bankruptcy Court.  Finally, the Bankruptcy Court has jurisdiction over any additional portions of this matter not covered by the above pursuant to 28 U.S.C. § 1367.

7.     This is a core proceeding as that term is defined in 28 U.S.C. § 157(b)(2).

8.     To the extent any portions of this complaint are non-core, the Bankruptcy Court may hear the claims and issue findings of fact and conclusions of law and the Trustee consents to the Bankruptcy Court issuing a final order.

9.     Venue in this district is proper pursuant to 28 U.S.C. § 1409 because this action arises in or relates to a case under the Bankruptcy Code that is pending before the Bankruptcy Court. [1]

---

[1] Substantially all of the facts herein relate to the period prior to the Trustee's appointment and were derived through the Trustee's investigation.

## The Parties

### The Plaintiff

10.    Plaintiff Lori Lapin Jones is the Chapter 11 trustee for the Debtors' estates.

### The Defendants

A.  The Individual Defendants

11.    Defendant Steven Zakheim, also known as Shlomo Zakheim, resides at 1048 East 28th Street, Brooklyn, New York 11210.  Steven Zakheim conducted business from his main office at 5350 Kings Highway, Brooklyn, New York 11203 ("5350 Kings Highway").  Steven Zakheim also maintains an apartment at the 5350 Kings Highway complex.  In addition, Steven Zakheim owns or owned, in his own name, the property at 5811 Foster Avenue, Brooklyn, New York, 11234 ("5811 Foster Avenue").

12.    Defendant Suzanne Faye ("Faye Zakheim") Zakheim is the wife of Steve Zakheim and resides at 1048 East 28th Street, Brooklyn, New York 11210.  Faye Zakheim held herself out as sole shareholder of Revival HHC and sole member of Revival Funding and Revival Acquisition.

13.    Defendant Todd Miller maintains residences at 23 Countryside Lane, Marblehead, Massachusetts 01945 and One Wall Street Court, Apt. 1309, New York, NY 10005.  Miller served as the Chief Restructuring Officer of the Debtors from September 1, 2011 through October 2, 2011.  On October 3, 2011, Miller became the Chief Executive Officer of the Debtors and served in that role until March 2012.  Pursuant to a declaration filed with the Bankruptcy Court by Todd Miller, Miller irrevocably and unconditionally submitted to the exclusive

jurisdiction of the Bankruptcy Court over any suit relating to his services to the Debtors (February 10, 2012 Declaration, ¶ 13).

14.    Defendant Ari Weiss, also known as Aryeh Weiss, also known as Samuel A. Weiss, resides at 1251 East 29th Street, Brooklyn, New York 11210.  Weiss is the son-in-law of Steven Zakheim.  Weiss is also a principal of NAE Edison, LLC d/b/a Edison Home Health Care, a licensed home care agency.

15.    Defendant Isaac Soskin resides at 978 East 28th Street, Brooklyn, New York 11219.  At all relevant times, Isaac Soskin held himself out as the chief executive officer of Gamzel NY Inc. d/b/a Revival Home Health Care.  In addition, Soskin held himself out as the chief executive officer of Revival Funding Co. LLC and either the chief operating officer or the chief executive officer of Revival Acquisition Group LLC.  At his examination conducted under Bankruptcy Rule 2004, Soskin could not definitely state what position he held at Revival Acquisition Group LLC.  Isaac Soskin claims to own Gamzel NY Inc. d/b/a Revival Home Health Care as of March 2013.

B.    The Corporate Defendants

16.    Defendant Revival Funding Co. LLC ("Revival Funding") is a New York limited liability corporation.  According to a UCC-1 Financing Statement, Revival Funding's principal place of business is 5350 Kings Highway.

17.    Defendant Revival Acquisition Group LLC ("Revival Acquisition") is a New York limited liability corporation.  Revival Acquisition's address is 5350 Kings Highway.

18.    Defendant Gamzel, NY, Inc.  d/b/a Revival Home Health Care ("Revival HHC") is a New York corporation with a principal place of business at 5350 Kings Highway.  Revival HHC is a certified home care agency.

5

19.     Defendant Metropolitan Home Health Products Inc. d/b/a MetroStar ("MetroStar") is a New York corporation owned by Steven Zakheim who serves as its chief executive officer.  MetroStar sells home health products to, among other companies, home care patients of Revival HHC and Edison HHC.  According to the records of the New York Secretary of State, MetroStar's address is 5350 Kings Highway.

20.     Defendant Gamzel LLC is a New York limited liability corporation owned by Steven Zakheim with its principal place of business at 5350 Kings Highway.

21.     Defendant Senior Script Pharmacy LLC ("Senior Script") is a New York limited liability corporation with its principal place of business at 5809 Foster Avenue, Brooklyn, New York 11234.

22.     Defendant Revival Pharmacy LLC is a New York limited liability corporation with a mailing address of 5350 Kings Highway and a principal place of business at 5809 Foster Avenue, Brooklyn, New York 11234.  Moshe Soskin, the son of Isaac Soskin, is a manager at Revival Pharmacy.  At each of their Bankruptcy Rule 2004 examinations, Isaac Soskin, Todd Miller and Steven Zakheim testified that they believed that Revival Pharmacy LLC had succeeded to Senior Script or was purchased from Senior Script.  Accordingly, Revival Pharmacy is sued herein as the successor to Senior Script.

23.     Defendant NAE Edison, LLC d/b/a Edison Home Health Care ("Edison HHC") is a New York limited liability corporation with its principal place of business at 946 McDonald Avenue, Brooklyn, New York 11218.  Edison HHC is owned and managed by defendant Ari Weiss.

6

C. Non-Defendant Members of the Enterprise

A. Individual Members

24.     Zorach Donn is Steven Zakheim's longtime private accountant.  On Steven Zakheim's behalf, Donn handles the finances and the bank accounts for Steven Zakheim's business and personal matters.  He maintains an email address at the same domain as Steven Zakheim and Steven Zakheim's secretaries.  According to Todd Miller, Zorach Donn is one of two members of Revival Funding.  Donn has also been identified as a manager of Revival Funding.

25.     Moshe Klerer resides at 1054 East 28th Street, Brooklyn, New York, 11210. Moshe Klerer is a son-in-law of Steven Zakheim and manages K2 Health Products LLC.

B. Corporate Members

1. Entities Associated With 5350 Kings Highway

26.     5350 Kings Highway, LLC is a New York limited liability company owned by Steven Zakheim.  5350 Kings Highway, LLC owns the real property located at 5350 Kings Highway.

27.     Revival Medical Supplies LLC is a New York limited liability corporation whose headquarters are at 5350 Kings Highway.  According to records of the New York Secretary of State, Revival Medical Supplies LLC's authorized process recipient is Moshe Klerer.

28.     Ahava Home Care LLC d/b/a RevivalCare is a New York limited liability company with its principal place of business at 5350 Kings Highway.  Todd Miller served as the Chief Executive Officer of RevivalCare.

29.    K2 Health Products LLC ("K2 Health") is a New York limited liability corporation located at 5350 Kings Highway. K2 Health is managed by defendant Moshe Klerer. K2 Health manufactures and sells incontinence products.

30.    New York Home Care PAC, Ltd is a New York not-for-profit corporation and a registered political action committee with the Federal Elections Committee. Its principal office is located at 5350 Kings Highway. Isaac Soskin was its President and Treasurer and Todd Miller was its Chief Executive Officer. Zorach Donn tracks receipts and disbursements for this entity.

31.    New York Home Care Coalition Ltd is a New York not-for profit corporation located at 5350 Kings Highway. Its managers were Todd Miller and Isaac Soskin. Zorach Donn tracks receipts and disbursements for this entity.

32.    OnLineBackupVault LLC is a New York limited liability company with a service of process address of 5350 Kings Highway and provides electronic data backup.

33.    New York Regional Services LLC d/b/a New York Regional Dialysis Center ("New York Regional Dialysis") was an entity formed to establish a dialysis center to be located at 843 Lexington Avenue, Brooklyn, New York 11221. Its members were Todd Miller, Faye Zakheim, Moses Gross and Abraham Klein. Its managers were Todd Miller and Moses Gross. Its landlord was Steven Zakheim. Its principal place of business was 5350 Kings Highway.

34.    843 Lexington Avenue LLC is a New York limited liability company with its principal place of business at 5350 Kings Highway. It is owned and managed by Steven Zakheim and owns the property at 863 and 843 Lexington Avenue in Brooklyn. It is the landlord for New York Regional Dialysis Center.

35.    5377 Kings Highway Realty Corp. is a Delaware corporation with its principal place of business at 5350 Kings Highway. Steven Zakheim is its chief executive officer.

8

36.    5377 Kings Highway Partners, LP is a New York limited partnership directly or indirectly controlled by Steven Zakheim.  It owns the properties across the street from the 5350 Kings Highway complex where certain of the Defendants conduct operations.

37.    General Medical Services of Kings Highway PC is a New York corporation with a principal place of business at 5359 Kings Highway, Brooklyn, New York 11203 (across the street from the 5350 Kings Highway complex).  According to the National Provider Indentifier ("NPI") Registry maintained by the National Plan & Provider Enumeration System, Todd Miller is the chief executive officer.

38.    5809 Foster Avenue Corp. is a Delaware corporation with its principal place of business at 5350 Kings Highway.  Its chief executive officer is Steven Zakheim.

39.    5811 Foster Avenue LLC is a New York limited liability company located at 5350 Kings Highway.

### 2.    Entities Associated With 5811 Foster Avenue

40.    Metro North Ambulance Corp. k/n/a SEZ North Corp. is a New York corporation with its principal place of business at 5811 Foster Avenue.  Its chairman or chief executive officer is Steven Zakheim.

41.    Metropolitan Ambulance & First-Aid Corp. k/n/a SEZ Metro Corp. was a New York corporation dissolved in or about October 2009.  Its principal place of business was 5811 Foster Avenue and its chief executive officer was Steven Zakheim.

42.    5809 Foster Partners, LP is a Delaware limited partnership located at 5811 Foster Avenue.

    3.  <u>Other Entities Related to Ari Weiss</u>

43.    AssistCare Health Services LLC d/b/a Preferred Home Care ('<u>Preferred Home Care</u>") is a New York limited liability company located at 1267 57th Street, Brooklyn, New York 11219 and owned by defendant Ari Weiss. Preferred Home Care operates a registered home care agency.

**<u>Allegations Applicable to All Claims for Relief</u>**

    I.  **<u>Background</u>**

        A.  <u>The Debtors</u>

44.    The Debtors are New York not-for-profit corporations.

45.    Peninsula Hospital Center ("<u>PHC</u>") was established in 1908 and was certified to operate 173 hospital beds. In addition to inpatient, surgical and emergency room services, PHC provided coma recovery and traumatic brain injury programs, occupational, physical, speech and vocational rehabilitation therapy programs and acute rental dialysis. Prior to its closing, PHC employed over 700 people.

46.    Peninsula General Nursing Home Corp. ("<u>PGN</u>") is a skilled nursing facility consisting of a 200 bed long-term care and rehabilitation center.

        B.  <u>The Debtors' Bankruptcy Cases</u>

47.    On August 16, 2011, an involuntary bankruptcy petition was filed against PHC. On September 19, 2011, PHC consented to entry of the order for relief and on the same day, PGN filed a voluntary bankruptcy petition (as to both the consent and the petition, the "<u>Consent/Petition</u>"). On September 21, 2011, the Bankruptcy Court entered an order for relief in PHC's case.

48.    In connection with the Consent/Petition, the Debtors moved to approve a September 1, 2011 letter agreement (the "September 1 Agreement") between the Debtors and Revival Acquisition to obtain post-financing on a secured and super-priority basis (the "Initial DIP Motion").

49.    On October 4, 2011, the United States Trustee for Region 2 (the "UST") filed an objection to the Initial DIP Motion.  The UST stated in her objection that "Revival's control of the Debtors and the terms of competing plans tip the balance of power to Revival to such an extraordinary extent that approval of the [financing] Agreements would inhibit meaningful negotiations with other creditors and parties in interest, potentially forcing them to accept courses of action or plan terms without recourse or risk implosion of the Debtors' cases."

50.    On November 30, 2011, the UST moved for entry of an order directing the appointment of a Chapter 11 trustee or, in the alternative, the appointment of an examiner.  The Debtors filed an objection to the motion.  The Debtors then consented to the appointment of an examiner on December 6, 2011.  On December 9, 2011 the Bankruptcy Court entered an order directing the appointment of an examiner (the "Examiner Order").

51.    On December 9, 2011, the Debtors submitted a new motion to obtain post-petition financing from Revival Funding (the "Second DIP Motion") pursuant to a proposed credit and security agreement (the "DIP Loan").  The UST filed an objection to the Second DIP Motion and asserted that the new proposed DIP Loan "falls squarely within the scope of the examiner's investigations as set forth in the Examiner Order.  Approval of the Credit Agreement, even on an interim basis, could impede the investigation to the detriment of the bankruptcy estate, the creditors and the integrity of the bankruptcy system."  On December 15, 2011, the Bankruptcy Court held a hearing on the Second DIP Motion.

11

52.    On December 16, 2011, the Bankruptcy Court approved the appointment of Richard J. McCord as examiner (the "Examiner").

53.    On December 22, 2011, the Bankruptcy Court entered an Interim Order Authorizing Secured Postpetition Financing With Certain SuperPriority Provisions (the "Interim DIP Order"), authorizing the Debtors to borrow up to $1.2 million from Revival Funding under the DIP Loan.

54.    On January 6, 2012, Revival Funding wired $1 million to PHC pursuant to the DIP Loan.

55.    On January 6, 2012, the Debtors filed a motion seeking entry of a final order authoring the Debtors to obtain secured post-petition financing on a super-priority secured basis (the "Final DIP Motion").  The Final DIP Motion sought final approval of a modified version of the DIP Loan.

56.    On January 31, 2012, the Examiner filed a preliminary report (the "Examiner's Report") in which he preliminarily concluded, inter alia, that (a) simultaneously with the commencement of the Examiner's investigation, "the Debtors' Board of Directors and the [Finance & Operation] Committee have taken steps to institute procedures that ensure that the Debtors properly exercise their fiduciary duties to the estates and all of their creditors; " (b) "During the Examiner's investigation, the Debtors and Revival renegotiated the terms of the loan transaction which was the subject of the [Initial DIP Motion] and notified the Court that their respective obligations under the Revival Acquisition Letter were null and void;" and (c) "[t]he transaction contemplated by the Debtors' [Final DIP Motion] cannot be properly evaluated without further information integral to these cases."  The Examiner stated, but did not conclude,

that he had "found no evidence of fraud, collusion or undue influence on the part of Revival Funding in its dealings with the Debtors."

57.    On February 7, 2012, the UST objected to the Final DIP Motion.  Among other things, the UST argued that the Debtors "have not produced any competent evidence to support their claim of an inability to obtain alternative financing.  Unless the Debtors present such competent evidence in support of the Motion, the Court should deny relief."

58.    On February 10, 2012, the Debtors filed the Declaration of Joel Miele, Sr., the Debtors' chairman of its boards of directors, in further support of the Final DIP Motion, in which Mr. Miele swore that the Debtors Boards of Directors selected Revival Funding out of three competing DIP lenders.

59.    On February 13, 2012, Revival HHC and Revival Funding filed a statement in response to the Examiner's Report and in further support of the Final DIP Motion (the "Revival DIP Statement").  The Revival DIP Statement highlighted certain findings of the Examiner's Report to support the Final DIP Motion and presented new information to "dispel any lingering concern" about transactions with Revival HHC, Revival Funding and their affiliates.

60.    On February 13, 2012, the Debtors filed a response to the Examiner's Report and the declaration of Todd Miller in further support of the Final DIP Motion.

61.    On February 17, 2012, the Bankruptcy Court entered the Final Order Authorizing Secured Postpetition Financing with Certain Superpriority Provisions (the "Final DIP Order").

62.    On February 23, 2012, Revival Funding wired $800,000 to PHC pursuant to the DIP Loan.

63.    On February 21 and 22, 2012, the New York State Department of Health (the "DOH") conducted an inspection of the clinical laboratory at PHC.

13

64.     On February 23, 2012, the DOH issued an order for summary action suspending the permit for PHC's laboratory (the "Lab Suspension") as a result of serious deficiencies in the administration and operation of the PHC lab.  On the same date, the DOH issued a second order (the "Suspension and Diversion Order") stating that "the continued operation of [PHC] without the services of its clinical laboratory poses a danger to the health of current and future patients of [PHC]."  (both orders, the "DOH Orders").  The DOH Orders required that (a) ambulances be diverted from PHC, (b) PHC immediately cease admitting new patients, (c) PHC immediately develop a plan to transfer out all current patients, (d) PHC cancel all surgeries and procedures and (e) PHC immediately suspend all general activities dependent on PHC's laboratory.

65.     On February 24, 2012, the UST filed a motion to appoint a Chapter 11 trustee because of the "the gross mismanagement and incompetence" of the Debtors' management.

66.     On February 26, 2012, Revival Funding filed a statement opposing the UST's motion for the appointment of a trustee on the grounds that the events leading to the DOH Orders did not demonstrate gross mismanagement of the Debtors.  The Debtors also filed an objection to the UST's motion to appoint a trustee.

67.     Subsequently, Revival Funding and the Debtors withdrew their opposition and, by order dated March 6, 2012, the Bankruptcy Court directed the appointment of a Chapter 11 trustee.

## II.   The RICO Enterprise Controlled by Steven Zakheim

### A.   The Health Care Empire Controlled By Steven Zakheim Constitutes a RICO Enterprise

#### 1.   The Structure of the Enterprise

68.     Steven Zakheim manages and controls the enterprise.

14

69.     The enterprise has a common purpose and mission, namely to enrich Steven Zakheim and his family through various businesses generally engaged in the health care industry.

70.     The enterprise has a hierarchical structure with Steven Zakheim at the top.  His principal lieutenants are Isaac Soskin, Ari Weiss, Moshe Klerer, and until April 2013, Todd Miller.  This hierarchy trumps corporate form, such that lieutenants have control over and can give direction to employees of companies with which they have no relationship.

71.     Zorach Donn also plays an instrumental role in coordinating the financial activities of the enterprise.  For example, on a weekly basis, Zorach Donn reports the bank balances and cash positions for all the enterprise entities to Steven Zakheim.  Donn takes the cash balances (and projected recoupments) for each entity in the enterprise and combines them all together with the Zakheim's personal bank accounts so as to report on the weekly cash position of the enterprise as a whole.  These reports are given to Steven Zakheim even though he does not have an ownership interest in, position, or relationship with many of the enterprise entities including Revival HHC, Revival Funding, Revival Acquisition, RevivalCare, Revival Pharmacy, OnlineBackupVault, Edison HHC, Preferred Home Care, the New York Home Coalition or the New York Homecare PAC.

72.     In addition to joint reporting of their financial affairs, the entities in the enterprise do business with, through and in tandem with each other.  Employees and resources are commingled and overlapping between the entities.  The corporate entities of the enterprise can be grouped as follows:

    a.   Enterprise Command

- Gamzel LLC – Steven Zakheim, assisted by his personal secretaries and Zorach Donn

b.  Companies providing health care services:

- Revival HHC – Certified home health care
- Edison HHC – Licensed home health care
- Preferred HC – Registered home health care
- General Medical Services of Kings Highway – emergency care
- New York Regional Dialysis – dialysis

c.  Companies providing medical equipment or pharmaceuticals

- MetroStar – home health products
- K2 Health – incontinence products
- Revival Pharmacy -- pharmaceuticals
- Senior Script -- pharmaceuticals
- Revival Medical Supplies - supplies

d.  Other Health Care Related businesses

- Revival Care
- SEZ North
- SEZ Metro (dissolved)

e.  Companies owning or managing the real estate for the health care/ medical equipment businesses

- 5350 Kings Highway
- 843 Lexington
- 5377 Kings Highway Realty
- 5377 Kings Highway Partners
- 5809 Foster Avenue LLC
- 5811 Foster Avenue LLC

f.  Support services for the enterprise

- Online Backup Vault – data backup service
- New York Home Care Coalition – political advocacy
- New York Home Care PAC – political advocacy

g.  Companies formed to acquire and/or fund the Debtors

- Revival Funding
- Revival Acquisition

## 2.  The Enterprise Engages in Interstate Commerce

73.    The health care companies in the enterprise derive the substantial portion of their income from Medicare and Medicaid.  Specifically, Revival HHC, Edison HHC, MetroStar, Revival Pharmacy, and Senior Script bill Medicare and Medicaid.  Applications to and bills to Medicare and Medicaid are submitted to the United States Centers for Medicare and Medicaid Services ("CMS") and transmitted over the internet through the instrumentality of interstate wires.

74.    Companies in the enterprise are engaged in manufacturing and importing health care products from the Far East and in purchasing products from across the United States for resale.  Specifically, K2 Health and MetroStar engage in these activities and sell to patients of Revival HHC.

75.    One of the enterprise's senior lieutenants, Todd Miller, travelled from his home in Massachusetts to New York almost weekly for the purpose of overseeing the enterprise's affairs.

76.    The enterprise is generally engaged in the provision of health care services affecting interstate commerce.

## 3.  The Enterprise Engaged and Generally Engages in a Pattern of Racketeering

## (a)  Predicate Acts in Connection with Revival HHC – 2005 through the Present Day

77.    As of 2005, Steven Zakheim and Isaac Soskin both understood that the DOH would not be granting Steven Zakheim future licenses to operate health care agencies.  Among other things, prior to 2005,

- Steven Zakheim had submitted a false application for an emergency medical technician license in which he attested that he had never been convicted of a crime, when in fact he had been convicted of a misdemeanor for sexual assault.

- According to the United States Department of Justice, the United States had intervened in a *qui tam* action against Steven Zakheim and his ambulance companies, Metropolitan Ambulance & First Aid Corp and Metro North Ambulance Corp., alleging that Steven Zakheim caused the use of hundreds of forged documents for the purpose of defrauding Medicare of millions of dollars.

- The United States also indicted Steven Zakheim on charges including violations of 18 U.S.C. § 1001 (False statements to the United States government) in connection with using his employees at his ambulance company to make illegal campaign contributions. In 2004, Steven Zakheim pled guilty to making an illegal campaign contribution.

78.    In 2005, Faye Zakheim purchased Revival HHC from its previous owner and applied for a Certificate of Need from the DOH and the New York Public Health Council (the "New York PHC"). Revival HHC needed a Certificate of Need to operate a certified home care agency. Without proper licensure by New York State, Revival HHC would be unable to bill Medicare and Medicaid for certified home health services. In 2005, applications for Certificates of Need were required to be filed by being mailed to the DOH.

79.    As a condition for obtaining the Certificate of Need for Revival HHC, the DOH required both Steven Zakheim and Faye Zakheim to submit sworn affidavits attesting that Steven Zakheim would not be involved with Revival HHC. As Isaac Soskin testified, the DOH told him that:

> The license is being granted to Faye. We [the DOH] won't grant any more licenses to Steve, in terms of Medicare-Medicaid. You got to be responsible for the operation. He is to have nothing to do with the day-to-day operation or the building of this operation.

(Bankruptcy Rule 2004 examination of Isaac Soskin).

80.    According to Steven Zakheim, the DOH required the affidavits prohibiting his involvement with Revival HHC because of (a) "a cloud of either Medicare or Medicaid fraud" surrounding him and (b) because of the false E.M.T. application.

81.     According to Isaac Soskin, the DOH told Soskin that it would no longer grant any more licenses to Steven Zakheim with respect to organizations billing Medicare and Medicaid and would not grant Steven Zakheim any further Medicare or Medicaid IDs.

82.     In June 2005, both Steven Zakheim and Faye Zakheim signed and submitted affidavits to the DOH and the New York PHC attesting that Steven Zakheim would "not have any direct or indirect involvement with the operation, management or control of the CHHA [certified home health agency]."  Isaac Soskin notarized both affidavits.

83.     Both affidavits were false.

84.     Following submission of the affidavits, the New York PHC mailed a final approval letter to Revival HHC on November 28, 2005.

(i)     <u>Mail and Wire Fraud in Connection with Billing Medicare and Medicaid</u>

85.     As a condition of participation in Medicare and Medicaid, Revival HHC was required to be in compliance with all state regulations.  (42 C.F.R. § 484.12(a)).  In addition, Revival HHC was required to disclose to the DOH, at the time of Revival HHC's initial request for certification, and at the time of any change in ownership or management, the identity of all persons with an ownership or control interest in Revival HHC, and each person who was a managing employee  (42 C.F.R. § 484.12(b)).  In addition, Revival HHC was required to submit the certificate it received from the New York PHC to the United States Centers for Medicare and Medicaid Services ("<u>CMS</u>").

86.     Revival HHC applied to CMS to participate in Medicare and Medicaid and necessarily represented that it had obtained the proper certificates and licensure from New York State.  Between 2006 and the present, Revival HHC has submitted bills to Medicare and

Medicaid based upon its New York certification, and received payment in the ordinary course of its business.

87.      In 2006, applications to Medicare and Medicaid were submitted through CMS' online application process.  Bills to Medicare and Medicaid are necessarily submitted through the internet or the mails.  Payments by Medicare and Medicaid are made through wire transfers of federal funds or checks sent through the mail.

(ii)      <u>Steven Zakheim Operates Revival HHC in Defiance of the Affidavits</u>

88.      Steven Zakheim controlled the operations of Revival HHC and was a decision maker at all times from 2005.  Faye Zakheim is a professor of social work at New York University.  Emails sent to Faye Zakheim's Revival HHC email account were forwarded to Steven Zakheim.

89.      Soskin testified that he reported on a monthly basis to Steven Zakheim regarding revenues, expenses, major purchases, high salary hires, legal matters and state audits regarding Revival HHC.

90.      Steven Zakheim was dismissive of his wife and discounted real involvement by his wife in the affairs of Revival HHC and its affairs.  For example, Faye Zakheim advised Steven Zakheim not to hire Todd Miller for the position of Chief Restructuring Officer of the Debtors.  When asked at his Rule 2004 examination how he responded to his wife's opinion, Steven Zakheim testified that he dismissed it by responding "What do you have for supper?"  As set forth herein, Steven Zakheim proceeded to hire Miller anyway.  When asked whether Faye Zakheim had contributed to Revival HHC's website, Steven Zakheim opined that Faye Zakheim did not even know how to turn on a computer.

91.     Isaac Soskin has worked for Steven Zakheim and his businesses continuously since 1993.  Soskin knew at the time that he notarized Faye Zakheim's and Steven Zakheim's affidavits of the prohibition on Steven Zakheim's involvement because the DOH spoke with him directly and told him that Steven Zakheim could not have any involvement with Revival HHC.

92.     Isaac Soskin participated in the scheme to defraud the DOH and by extension Medicare and Medicaid.  With Steven and Faye Zakheim's knowledge, Soskin purposefully held himself out as the chief executive officer of Revival HHC in order to keep Steven Zakheim's involvement from the DOH.   By facilitating Steven Zakheim's control in violation of the affidavits, Soskin maintained his position as chief executive of Revival HHC.

93.     Isaac Soskin did not have the authority to disburse funds or to make payments at Revival HHC.  Soskin was required to ask permission of Zorach Donn, Steven Zakheim's long time accountant, for approval of disbursements.  Mr. Donn was not employed by for Revival HHC and worked for Steven Zakheim and had an email address at Gamzel LLC.

94.     In March 2013, Isaac Soskin purchased Revival HHC from Faye Zakheim. Pursuant to the sale terms, Soskin will pay monthly amounts for eleven years.  During that time, he is required to send monthly financial statements to both Steven Zakheim and Faye Zakheim.

(b) The Fraudulent Scheme to Acquire and Integrate the Debtors Into the Enterprise

95.     Steven Zakheim with the agreement and assistance of the defendants planned to integrate the Debtors into this enterprise.  The Debtors would serve as potential sources of revenue and would also serve as lucrative sources of business and profit for the other enterprise business lines.

96.     On September 21, 2011, Moshe Klerer wrote to Zakheim suggesting that the "conglomerate" use the Debtors to obtain more aggressive pricing for all the entities by

21

conducting its purchasing through the Debtors.  As Klerer explained, the enterprise could obtain

better pricing by: (1) ordering items at hospital and nursing home rates, instead of the rates

currently in effect for the various enterprise businesses and (2) "your volume as a conglomerate

will also lead to more aggressive pricing than if each business is purchasing separately."

97.     Steven Zakheim caused Revival Funding and Revival Acquisition to be formed

and presented them as 'affiliates' of Revival HHC.

98.     Revival Acquisition and Revival Funding were sham entities controlled entirely

by Steven Zakheim with no true officers, no cash, no assets, no offices, and no business dealings.

The putative chief executive, Isaac Soskin, had no role or involvement with these entities other

than to sign documents which were put in front of him.  The only other executive assisting

Steven Zakheim with these entities was Todd Miller.

99.     In August 2011, even before Revival Acquisition and Revival Funding were

formed, Steven Zakheim directed the exploration of a possible transaction with the Debtors.

Steven Zakheim designated Todd Miller as his point person to explore lending opportunities with

the Debtors and asked Todd Miller to contact the Debtors to see if Revival HHC could provide

liquidity.  Steven Zakheim admitted that, other than lawyers, only he and Mr. Miller were

involved in the details of how the transaction with the Debtors would be structured.

100.    Steven Zakheim directed the hiring of counsel for Revival Funding and Revival

Acquisition.  Steven Zakheim directed Todd Miller to hire Isaac Nutovic as counsel on the

lending transaction with the Debtors.  Thereafter, Todd Miller, while he served as the Debtors'

chief executive, reviewed, negotiated and authorized the payment of Nutovic's bills on behalf of

Revival HHC for the work Nutovic performed in connection with Revival Funding's and Revival

Acquisition's transactions with the Debtors.

101.    Steven Zakheim made the decisions concerning funding the Debtors and the terms and timing of the proposed DIP Loans.  Steven Zakheim considered the funds loaned to the Debtors by Revival Funding to be his funds.  For example, on December 6, 2011, in the context of the DIP negotiations, Steven Zakheim emailed Todd Miller:

> **Here is my offer** and **I hope** that someone will refuse it. **I will** make the loan on the following terms.
>
> Loan would be two and half million.
> Interest rate would be at 9 percent.
> it will only be paid if 1199 gives **me** super priority behind the real estate bond and the water bill.
> Maximum for the professional fees (crooks) is 200,000.
> **I will** not pay if a trustee is appointed
> **I need to know in advance before money is paid** what the scope, dollar
> amount, and time frame for the examiner will be.
> No further money would be given unless 1199 is resolved.
> There is no obligation to give more money **unless I feel comfortable.**
> **I am allowed to continue to be an unpaid observer and consultant if needed.**
> If someone else comes in to replace **me** they must repay **my monies.**

(Emphasis added).

102.    Despite representing himself to the Bankruptcy Court as the chief executive of Revival Funding and Revival Acquisition, Isaac Soskin was actually a stranger to the companies:

- Soskin admitted that he had no involvement in the negotiation of the September 1 Agreement, and that Steven Zakheim negotiated it on behalf of Revival Acquisition.  The first time he saw the document was when it was placed in front of him to sign.

- Soskin did not have any understanding of the September 14, 2011 security agreement pursuant to which Revival Funding loaned $1.5 million to the Debtors.  Soskin had no involvement in the negotiation of the agreement and had no understanding of how much money was being secured.

23

- Soskin did not know whether there were members of Revival Funding and Revival Acquisition.

- Soskin did not know where Revival Funding or Revival Acquisition maintained a bank account and had never seen a tax return for Revival Acquisition.

- Soskin had no knowledge of who engaged Nutovic to represent Revival Funding and Revival Acquisition or under what terms. Soskin admitted that he understood that Nutovic did not report to him, but instead Nutovic was the attorney for the Zakheims regarding the Debtors.

103. In fact, Soskin never learned how much money Revival Funding had loaned to the Debtors until well after the fact, after PHC closed:

> Q:   Do you have any understanding of how much money was lent under -- in connection with the security agreement?
> A.   After the fact, I heard something from either Steve or Faye -- said, like:  $4 million was put up there.  That's all I heard.
> Q.   Do you know how much money was ever lent by Steve, and Faye, or anyone to Peninsula?
> A.   Just what I heard from them -- like, hearsay.
> Q.   The 4 million?
> A.   Yeah -- but the hospital went down.  Remember, I said, like: how much money is tied up?  They said:  Oh, it was, like, $4 million.
> Q.   That was the first time you heard how much money had been lent?
> A.   Yeah.
> Q.   As you sit here today, you don't know what the terms were? Or what any of the conditions?
> A.   No.
> Q.   You don't even know what the money was used for, do you?
> A.   No.

(Soskin Examination, 271-272).

### III.    Steven Zakheim Controlled the Debtors

#### A.   Steven Zakheim Installed Todd Miller at the Debtors

104.   Todd Miller had no experience managing, administering or working in a hospital, a nursing home or a similar health care facility.  Steven Zakheim needed someone running the

Debtors who would report directly to him so that Steven Zakheim could control the Debtors for Steven Zakheim's benefit.  The fact that Miller had no experience or qualifications in running a hospital or nursing home or in complying with applicable federal and state regulatory requirements did not deter Steven Zakheim from making Todd Miller's appointment as chief restructuring officer and then chief executive officer a condition of his lending to the Debtors.

105.    Pursuant to the September 1 Agreement, the Debtors agreed to install Todd Miller as chief restructuring officer with the power to hire and fire any officer or employee of the Debtors.  Shortly after the Consent/Petition, and after discussion with Steven Zakheim, Todd Miller fired Robert Levine, the Debtors' long time chief executive officer and took over that role.

106.    Steven Zakheim also decided that Todd Miller would be the chief restructuring officer of the Debtors over the objections of Faye Zakheim.

107.    Miller understood that as chief restructuring officer and then chief executive officer of the Debtors, he owed his position to Steven Zakheim and served at his pleasure.  For example,

- As chief restructuring officer and then chief executive officer of the Debtors, Miller transferred his paychecks, net of taxes, to Steven Zakheim (and in one instance Revival HHC).

- Miller committed to Steven Zakheim that he would "involve you in decisions going forward. If I should be looking for a [new] job please let me know."

- Steven Zakheim promised Miller that if he failed with the Debtors that his future position would be secure in the enterprise.
  Zakheim:      I have complete trust and faith that you can make this happen.
  Miller:       And if I can't do I have a future with you?
  Zakheim:      Always.

(email exchange commencing the date of the Consent/Petition).

108.    In fact, shortly after Todd Miller was terminated by the Trustee from his position with the Debtors, he was re-employed at his same salary and with his previous benefits by another entity of Steven Zakheim.

B. <u>Steven Zakheim Acted as the Chief Executive of the Debtors</u>

1. <u>Steven Zakheim Worked Out of the Debtors' Executive Suites and Emergency Room</u>

109.    On or about September 1, 2011, Steven Zakheim, with Todd Miller's assistance, obtained access to the Debtors':  he received an authorized PHC hospital I.D., he was given a telephone extension and he was allowed to come and go throughout the facilities as he pleased.

110.    When at the Debtors, Steven Zakheim spent most of his time in the Debtors' executive suite and in the PHC emergency room.  When asked at his Bankruptcy Rule 2004 examination why he allowed Steven Zakheim full access to the emergency room despite having no medical training and no formal or disclosed relationship with the Debtors, Todd Miller explained that Steven Zakheim was a "brilliant businessman who has about 30 years of experience working in most of the major hospitals in New York City."  Steven Zakheim admitted that he had no experience administering a hospital.

2. <u>Steven Zakheim Involved Himself in Major Decisions of the Debtors</u>

111.    From September 2011 through February 2012, Steven Zakheim involved himself in multiple facets of the Debtors' operations.  Steven Zakheim sent multiple emails a day checking in with Todd Miller or other employees, and gave out instructions on matters both large and small.  By way of  examples only, Steven Zakheim was involved with the following:

- Instructing Todd Miller to change the patient intake process so that Steven Zakheim could keep tabs on which doctors were bringing in the most money relative to their salaries.  "We want to keep the high admitters, and kill the low ones."

- Instructing Miller to make specific purchases of supplies and machines for the executive offices;
- Search for a director of the PHC emergency room, including interviewing candidates;
- Deciding whether PHC should continue to receive psychiatric patients from EMS
- Interviewing and hiring the Debtors' new chief restructuring officer
- Interviewing and elevating Dr. Abiola Familusi to be the Interim Executive Vice President for Clinical Services.
- Firing the chief administrator of the nursing ("Monday we need to dismiss Janet")
- Negotiating the terms of the contract between PHC and the proposed Revival pharmacy
- Interviewing doctors to hire
- Making sure machinery and equipment was purchased for the emergency room
- Overseeing the replacement for the Debtors' accounts payable and timekeeping systems
- Instructing Todd Miller to evict the Joseph P. Addabbo Family Health Center from the premises of PHC
- Deciding on the caterer and the admission pricing for the Debtors' gala dinner

3. <u>Zakheim Received Daily Reports Concerning the Operations of the Debtors</u>

112.    Steven Zakheim and Todd Miller instructed employees of the Debtors to send Zakheim daily reports concerning the operations of the Debtors.  For example, Zakheim received daily census reports showing how many patients were being treated at the Debtors and in what units.  In addition, Steven Zakheim received daily reports detailing patient discharges.  Almost daily, Steven Zakheim learned which patients died, which patients went to hospice, which patients were sent home and what kind of medical equipment they needed.  Steven Zakheim had no right to receive this type of patient information.

113.    Steven Zakheim requested all sorts of information and reports from the Debtors, such as emergency room logs, salaries of doctors working at the Debtors, drug prices and

analyses of what the Debtors' doctors were earning compared to their admissions.  For example,

on October 27, 2011, Steven Zakheim instructed Todd Miller

> For patients coming into ER, I would like the following information-
>
> Age- D.O.B. I need this to see how active the Pediatric unit is
> Diagnosis or Chief complaint
> Referring doctor (if any)
> Time Patient arrived to ER
> Time Patient triaged
> Time patient seen by doctor
> How patient came to ER- walk in or EMS, Private, Volunteer, and need name of service
> If patient came from Adult Home or Nursing Home – Which one?
>
> For patients being discharged I need the following information-
> How did the patient go home- Family, Ambulette, Ambulance – Name of Service
> Did the patient need D.M.E. equipment? If yes, which company was used?
> Did the patient need Home Care, if yes, which company used?
> I would like this DAILY. Any chance we can get this starting TODAY>???????

### 4.  Zakheim Conducted the Hiring of the Debtors' Senior Management

114.    Steven Zakheim was also involved in hiring new employees of the Debtors,

including senior management.  Todd Miller understood that he had little authority to make such

hires without Steven Zakheim's approval.  After making one such Vice Presidential hire without

apparently consulting Zakheim, Miller emailed Zakheim:  "I need to have 1 free pass. I don't ask

for too much…I trust you will support me. I don't do stupid things."

115.    Steven Zakheim and Todd Miller installed Dr. Abiola Familusi as the Interim

Executive Vice President for Clinical Services to oversee the hospital medical staff and as the

Medical Director for PGN.  Even the chief medical officer of PHC was to report to Dr. Familusi.

Dr. Familusi, in turn, reported to Todd Miller and frequently consulted with Steven Zakheim.

116.    Steven Zakheim also hired Michael Kaminski to serve as the Debtors' chief restructuring officer (after Todd Miller became the chief executive officer).  Steven Zakheim interviewed Kaminski, negotiated the terms of his salary, offered him the job, and committed to paying him a $10,000 signing bonus, which he subsequently paid through Revival HHC without disclosure to the Bankruptcy Court.  Below is a portion of an email from Steven Zakheim to Kaminski offering him the chief restructuring position:

> I like you and I think you are the best person for the job, and I agree to all the terms we discussed and would want you to start this Monday.  I am a man of my word and have one concern.
>
> We have the final bankruptcy court date next Friday October 7th.  We are having a few issues with the credit committee [sic] and with the trustee…
>
> Despite the above I decided for myself to give it all my time and money, but you have to make a decision about yourself.  I can give you the sign on bonus and I can give you the salary request.  The only thing I can't give is to sign my name and guarantee you the severance package of two months as we discussed and agreed….
>
> I have so far spent in excess of two million dollars, and most of it would be lost if the deal does not happen.  So you know where my faith lies.

(Emphasis added).

## IV.    Zakheim and Miller Operated the Debtors for the Benefit of Zakheim and His Enterprise

### A.    Directing Patients to Utilize Revival HHC and MetroStar

117.    Steven Zakheim sought to use the Debtors to generate referral business for the enterprise, including for Revival HHC and MetroStar.  Steven Zakheim instructed Todd Miller to direct all discharged patients needing home care to MetroStar and Revival HHC.  Similarly, Miller encouraged Isaac Newman, MetroStar's director of operations, to sell more medical

equipment to the Debtors' patients.  To this end, Steven Zakheim, through Todd Miller, installed Revival HHC and MetroStar representatives at the Debtors to guide patients towards selecting the services of Revival HHC and MetroStar.  Miller cleared these representatives through hospital security, or in some cases hired them, so that Revival HHC and MetroStar could sell to patients directly from PHC.

118.    Steven Zakheim required the Debtors' employees to send him discharge reports on a daily basis.  This allowed Steven Zakheim to monitor opportunities for his other businesses and to direct business away from his competitors.  For example, on November 9, 2011, Steven Zakheim berated Todd Miller for the previous day's discharge report which indicated that out of five patients discharged for home care, only three were directed to Revival HHC and no patients were diagnosed as needing any medical equipment.  "Why two cases to VNS & MJHS?" Zakheim asked, referring to two competing home care agencies.  "Can't believe that not one patient needed even a cane."

119.    To obtain more business for MetroStar and Revival HHC, Steven Zakheim and Todd Miller installed Miriam Gersh, a Revival HHC employee making over $200,000 a year, as a liaison between patients and their families and the hospital social worker overseeing their discharge.  Gersh's assignment was to direct patients to MetroStar and Revival HHC.  Revival HHC continued paying her salary although she was working at the Debtors.

      B.    <u>Directing Lucrative Business Deals and Transfers to Enterprise Businesses and Other Associates of Steven Zakheim</u>

    1.    <u>Purchasing</u>

120.    Steven Zakheim and Todd Miller positioned family members of Steven Zakheim or employees of the enterprise to control the Debtors' purchasing:

- Ari Weiss, despite holding no position with the Debtors or even with Revival HHC, was handed control over purchasing and maintained an office in the Debtors' executive suite.

- Ben Reisman and Josh Gross, former employees of MetroStar and Zakheim's enterprise, oversaw the day-to-day purchasing function. Reisman and Gross were likely paid by Zakheim's enterprise during their first two months at the Debtors as they did not begin receiving paychecks from the Debtors until November 2011.

121.    With control of purchasing, Steven Zakheim and Todd Miller could ensure that orders went out to Steven Zakheim's businesses or to Zakheim's business associates and that invoices from these entities were paid promptly, before other vendors and in a manner in which no other vendors were paid.

122.    For example, Ari Weiss engineered a $50,000 transfer to MetroStar on the evening that the Debtors filed the Consent/Petition.  Knowing that the Debtors were about to file, Weiss instructed MetroStar to send wire instructions for any amounts owing from the Debtors "in the next 20 minutes."  Informed that no amounts were due and that MetroStar had neither sent invoices to the Debtors or received invoices from its own suppliers, Weiss instructed MetroStar to submit a "guesstimate" for an on–account payment.  Not receiving the wire instructions fast enough, Weiss instructed MetroStar to "push" Zorach Donn to send the instructions.  Ultimately, Todd Miller confirmed to MetroStar's Mr. Newman and Weiss that the "Money was wired."  Less than one hour later, the PGN Voluntary Petition was filed and PHC consented to the order for relief.

123.    By way of another example, on November 8, 2011 the Debtors made an on-account wire transfer to Senior Script in the amount of $30,000, even though the Debtors had not yet received invoices from them.  Miller ensured that this payment was made, after the managers of Senior Script emailed him and Steven Zakheim requesting payment before they needed to pay

31

their wholesaler.  Todd Miller responded at 11:30 at night, "Money to be wired first thing."  When the wire did not arrive the next morning, Miller personally ensured that the wire was immediately made.  No other similar, non-enterprise post-petition vendors received on-account payments or payments before invoices were presented.

124.    To 'negotiate' the price at which the Debtors would order goods from MetroStar, Steven Zakheim offered to charge a premium of 10% above cost.  In response, Todd Miller countered that the Debtors should pay a 15% markup, an even higher number.  Zakheim agreed to go with the higher number.  The Debtors ultimately paid over $650,000 to MetroStar between September 2011 and March 2012.

125.    Todd Miller and Steven Zakheim also made sure that MetroStar's bills would be paid promptly.  For example, on October 24, 2011, Isaac Newman the director of operations of MetroStar emailed Reisman and Gross that the Debtors owed over $100,000 to MetroStar, but that Miller and Zakheim did not want to extend such credit for more than one more week.  Isaac Newman further told them, that "Steve is going to flip out if he realizes" that so much money is outstanding.  Over the next nine days, the Debtors transferred over $159,000 to MetroStar.

2.    <u>Undisclosed Benefits to the Enterprise</u>

126.    Certain defendants also caused the Debtors to grant or commit to undisclosed benefits to the Zakheim enterprise:

- At the suggestion of Ari Weiss (son-in-law of Steve Zakheim and Faye Zakheim), Steve Zakheim and Todd Miller implemented a plan to build a recruitment center at the Debtors for Edison HHC, Ari Weiss' company.  They had an enterprise lawyer prepare a draft lease.  No lease was ever entered into and yet Edison HHC began work setting up the center.  The transaction was never disclosed to the Bankruptcy Court and was hidden from the Examiner

- Without involvement by Debtors' counsel, Todd Miller offered that the Debtors would pay $40,000 of Nutovic's bill for legal services provided to Revival

Funding.  As Todd Miller explained to Nutovic, "I think we should do it. Steve has enough out of pocket and risk."  Nutovic agreed.  Yet this was never disclosed to the Bankruptcy Court.

- Revival HHC continued to pay Todd Miller his salary of $28,750 a month, plus expenses valued at $125,000 a year, while Todd Miller served as an officer of the Debtors.  Soskin claims that Faye Zakheim authorized these transactions as a loan to the Debtors which the Debtors would need to repay to Revival HHC.  Such a loan was never documented or disclosed to the Bankruptcy Court.

- Todd Miller transferred his salary to Steven Zakheim and to Revival HHC.  Todd Miller never disclosed this to the Bankruptcy Court.

- Zakheim and Miller installed an employee benefits brokerage firm that had a financial relationship with David Zakheim, Steven Zakheim's nephew, to interact with the employee benefit administrators.  The brokers were paid a commission by the benefit administrators which the Debtors were required to reimburse while the Debtors employed a fulltime executive to oversee the employee benefit plans. Empire Blue Cross Blue Shield alone paid a total of $44,105.30 to the firms associated with David Zakheim, which the Debtors were required to reimburse. This was never disclosed to the Bankruptcy Court.

3. <u>Transfers to the Zakheim Enterprise or Business Associates of Steven Zakheim</u>

127.    Prior to the appointment of the Trustee, the Debtors paid at least $1.3 million to persons and entities associated with Steven Zakheim.  Those payments included:

- Payments to MetroStar -- $650,872.19
- Payments to Senior Script – $213,859
- Payments to Revival HHC -- $34,975
- Payments to Todd Miller in salary and expenses - $222,674.99
- Payments to other employees of the enterprise -- $91,655.91
- Payments to brokerage firm associated with David Zakheim -- $44,105.30
- Payments to Qualmax, a company owned by a business partner of Todd Miller and Steven Zakheim -- $52,867

4. <u>Zakheim and Miller Caused the Debtors to Needlessly Spend Money to Hide Zakheim's Involvement</u>

128.    Steven Zakheim caused the Debtors to waste money to conceal his involvement.

129.    Steven Zakheim interviewed and caused the Debtors to hire Harbor Communications, to help dispel any perception of a conflict between Revival and the Debtors. Although no Bankruptcy Court approval for the retention was obtained or even sought, the Debtors paid Harbor Communications approximately $44,000 after the filing of the Consent/Petition.

130.    In response to the UST's objections that a conflict existed between Revival Funding and the Debtors' management, Steven Zakheim and Todd Miller caused the Debtors to consent to the appointment of an examiner to investigate that relationship when Steven Zakheim and Todd Miller knew full well what the relationship was and could have told the truth and reported the same to the UST and the Bankruptcy Court.  As a result, the Examiner and his professionals incurred over $213,221 in fees and expenses.

131.    Through the same course of action, Steven Zakheim and Todd Miller caused the Debtors to incur tens of thousands of dollars in legal and other professional fees responding to the Examiner's investigation.

132.    Steven Zakheim and Todd Miller caused the estates to incur the fees of Alvarez & Marsal to locate additional sources of financing which Todd Miller, to protect Steven Zakheim's investment, undertook efforts to sabotage.

**V.    Miller Sabotaged Efforts to Obtain Alternative Sources of Financing to Protect Zakheim's Interests**

133.    Todd Miller sabotaged efforts to shop or otherwise explore debtor-in-possession financing from sources other than Steven Zakheim.

- Todd Miller resisted signing standard non-disclosure agreements submitted (and executed) by lenders interested in exploring a DIP loan to the Debtors.  In fact, after one such request, Todd Miller asked Steven Zakheim for approval to sign such an agreement.

34

- Miller made no effort to contact twelve potential DIP lenders specifically identified to him by Alvarez & Marsal.

- Miller provided confidential information provided by competing DIP lenders to Steven Zakheim and Revival Funding's counsel at a time when Zakheim was finalizing Revival Funding's DIP proposal.

134.    When a potential investor cautioned Todd Miller that Steven Zakheim's involvement would lead to a decrease in financing given Steven Zakheim's "past issues", Miller refused to deal further with that investor.  On January 16, 2012, an executive at an investment group exploring financing options for the Debtors emailed Todd Miller: "is Steve Zakheim in anyway involved with Peninsula?  Assuming he was in the past what was the extent of his involvement.  He has past issues needless to say which could influence a capital raise."  Miller responded

> If you believe Zakheim is an issue, no need to continue a discussion.  He is part of the deal.

> We are lucky to have him involved.

135.    On January 25, 2012, Todd Miller instructed the Debtors' professionals:  "I just spoke to Steve Zakheim.  There is no need to look for a new lender at this time."

136.    Had the Debtors' Boards or the Debtors' creditors or parties in interest been apprised of the true nature of Steven Zakheim's and his enterprise's activities, they would have taken steps to curtail such activities and prevent defendants from undertaking what they did.

### VI.    Miller, with Zakheim's Knowledge, Made Fraudulent Statements to the DOH to Obtain Approval for the DIP Loan

137.    Pursuant to Section 2856 of the New York Public Health Law, real property owned by a nursing home cannot be encumbered without the express consent of the New York

State Commissioner of Health.  Therefore, in order to consummate the interim DIP financing, pursuant to the Interim DIP Order, DOH consent was required.

138.    On December 22, 2011, the DOH emailed Todd Miller that it needed additional information in order to assess the request to approve the DIP Loan.  One of the categories of additional information was the: "Written description of any relationship/ interest between Revival Funding and Steven Zakheim, including familial interests."

139.    Todd Miller immediately forwarded the email from the DOH, not to Faye Zakheim, but to Steven Zakheim and Isaac Nutovic, asking: "Can you please tell me the relationship between Steve Zakheim and Revival Funding?"  Steven Zakheim responded:  "Can we say it the money comes from both Faye and my savings?"

140.    Todd Miller rejected that approach:  "We don't need to go that deep.  All we need to say is that you are not an officer or involved in anything related to revival funding but for the fact that it's your wife."

141.    Instead of telling the truth that Steven Zakheim controlled Revival Funding and made the decisions concerning the DIP Loan, that Todd Miller was reporting to Steven Zakheim to protect his investment, and that Todd Miller had discussed the DOH's inquiry with Steve Zakheim and not with Faye Zakheim, Todd Miller responded to the DOH as follows:

> Faye Zakheim is the owner of Revival Funding Co. LLC.  Steve Zakheim has no interest or role in this entity.  Steve Zakheim is the husband of Faye Zakheim.

142.    This statement was knowingly false and fraudulently made in order to obtain consent from the DOH for the DIP Loan.

143.    Counsel for Revival Funding, Isaac Nutovic, immediately learned of Todd Miller's statement to the DOH and recognized it as false or misleading.  In an email he wrote

36

directly to Steven Zakheim, which Steven Zakheim then forwarded to Todd Miller, Nutovic cautioned, "I think this approach is wrong-headed and will lead to trouble for Todd and you if you adopt this approach."

144.    In response, Steven Zakheim again suggested to Todd Miller that Todd Miller tell the DOH that the funds employed by Revival Funding came from both Faye and Steven.  While providing marginally more information, this response would have also been false and misleading as it failed to convey Steven Zakheim's true involvement in Revival Funding.

145.    Later that day, the DOH followed-up with Todd Miller and asked him to provide "the financial statements for Revival Funding and information on the corporation's members." Todd Miller then forwarded the email to Steve Zakheim, with a cc to Steven Zakheim's counsel David Rabbach, mere hours after telling the DOH that Steven Zakheim had "no interest or role in this entity."  Todd Miller did not forward this email to Faye Zakheim.

146.    After learning that Steven Zakheim had just put in $1.2 million to fund the expected DIP draw, Miller reported to the DOH that Revival Funding had $1.2 million in assets.

147.    On December 28, 2011, in reliance on Miller's representations, the DOH consented to the encumbrance of PGN.

## VII.    False, Misleading and Incomplete Statements to the Bankruptcy Court Hid Zakheim's Takeover

1.    Misleading Statements Made in Soskin's "Lar-Dan" Affidavit

148.    On October 31, 2011, the UST objected to the Debtors' application to employ Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, & Einiger, LLP ("Abrams Fensterman") as counsel.  Among other things, the UST argued that because Abrams Fensterman received a pre-petition retainer from Revival Funding, the Debtors' pre-petition and proposed

post-petition lender, Abrams Fensterman was not disinterested and did had a conflict with the Debtors.  The UST also objected to the Debtors' retention of Alvarez & Marsal as financial advisors on the same grounds.

(a)  <u>The Fabricated Loan</u>

149.    On November 17, 2011, defendant Isaac Soskin filed a "Lar-Dan" affidavit (the "<u>Soskin Affidavit</u>") in response to the UST's objection.  Soskin swore that Revival Acquisition paid Abrams Fensterman $140,000 and Alvarez & Marsal $125,000.  However, Soskin described those disbursements of $265,000 as part of the $1.75 million pre-petition loan to the Debtors:

> These sums were part of $1.75 million in loans made to Debtors by Revival.  The loan proceeds were disbursed by Revival's counsel, Nutovic & Associates ("Nutovic"), as is common practice in such lending.  The payments made to Abrams Fensterman and A&M were loan proceeds disbursed by Nutovic and paid to the order of Abrams Fensterman and A&M at the direction of and for the convenience of the Debtors.  This is no different than a homeowner taking out a mortgage loan and at the closing requests the lender disburse a check to borrower's counsel from the loan proceeds to pay such attorney's fees.  It is done for the convenience of the borrower and does not establish that borrower's counsel has been retained by the lender.

(Soskin Affidavit, ¶ 5).

150.    Soskin's affidavit was false:

- None of the payments made to Abrams Fensterman and Alvarez & Marsal were part of the $1.75 million in loans made to the Debtors.  The Debtors had received the full loan proceeds of $1.75 million in wire transfers from Nutovic on behalf of Revival Funding.

- There was no additional loan or repayment provision for the funds disbursed to Abrams Fensterman and Alvarez & Marsal.

- To date, no Revival entity has asserted the pre-petition payments to Abrams Fensterman and Alvarez & Marsal as an unpaid debt owing from the Debtors.

151.    In other words, what Isaac Soskin described as a $265,000 loan made to the Debtors, disbursed at the Debtors' direction to the professionals, never existed.

152.    In addition, Soskin failed to disclose that Nutovic and Associates had paid at least $25,000 in additional funds to Abrams Fensterman pre-petition.

153.    Steven Zakheim was sent a draft version of the Soskin Affidavit minutes after it was sent to Isaac Soskin and before it was filed.

(b)    The Relationship Between Revival Acquisition, Abrams Fensterman and Alvarez & Marsal Was Not "Common Practice in Such Lending"

154.    In addition to paying the Debtors' lawyers and financial advisors, the Revival entities also oversaw their retention.  For example, instead of sending Abrams Fensterman sending its proposed retention agreement to the Debtors (its clients), Abrams Fensterman submitted it its proposed retention agreement to Nutovic for his review.  Nutovic revised the proposed retainer agreement between the Debtors and Abrams Fensterman and then Nutovic gave his approval directly to the Debtors that the retainer agreement could be released to Abrams Fensterman.   That is not "common practice in such lending."

155.    At his examination pursuant to Bankruptcy Rule 2004, Mr. Soskin claimed that he had no personal knowledge of the facts set forth in the Soskin Affidavit but that he obtained them from counsel to Revival Funding.

2.    Misleading Statements in the First Day Declaration

156.    On September 19, 2011, in connection with the Consent/Petition, the Debtors filed several "First Day Motions" all supported by the Declaration of Todd Miller (the "First Day Declaration") [Dkt. No. 22] submitted under penalty of perjury.

(a) <u>Corporate Structure and Management</u>

157.    The First Day Declaration stated that "[d]ecisions are made by the Boards, the Executive Committee and management." (First Day Declaration, ¶ 25).   This statement was misleading and incomplete because it omitted that many important decisions were being made by Steve Zakheim and that management (Todd Miller) was reporting to Steven Zakheim.

158.    To illustrate graphically how Todd Miller and Steven Zakheim viewed the decision making structure of the Debtors during September and October 2011, below is the table of organization agreed to by Zakheim and Miller:



(b) <u>Savings and Efficiencies in Purchasing Procedures and Vendor Relationships</u>

159.    The First Day Declaration also stated that "[p]revious purchasing and maintenance procedures have also been identified as inefficient; the Debtors believe that properly managing these procedures and vendor relationships will generate significant savings." (First Day Declaration ¶ 29).   This was misleading and incomplete because Todd Miller had

given control over these procedures and relationships to Steven Zakheim's son-in-law, Ari Weiss, to enhance and protect the interests of Zakheim and his entities.

160.    At almost the same time as Todd Miller was submitting the First Day Declaration, Todd Miller, together with defendants Ari Weiss, MetroStar and Revival Funding, were frantically working to override all of the Debtors' normal procedures and pay MetroStar thousands of dollars on account, before invoices were due and before the Consent/Petition.

(c)  Payments and Proposed Payments to Todd Miller

161.    Miller attached certain schedules required by E.D.N.Y. Local Bankruptcy Rule 1007-4 to his First Day Declaration.  As Exhibit K, Miller listed the amounts paid and proposed to be paid to him for services for the 30-day period following the filing of the chapter 11 petition. Next to his name, Miller reported the expected 30-day pay as $25,000.

162.    In fact, for his services as Chief Restructuring Officer, Todd Miller was receiving a salary of $30,000 a month from the Debtors.  Todd Miller was also receiving a salary of $28,750 a month from Revival HHC, plus his Manhattan rent (approximately $90,000 a year) paid for by Revival HHC.

163.    However, Todd Miller was not keeping his salary from the Debtors of $30,000 a month. Instead, Todd Miller was transferring his paychecks, net of taxes, to Revival HHC and Steven Zakheim.

3.  Misleading Statements in Miller's Employment Declaration

164.    On November 15, 2011, Todd Miller submitted a Declaration of Disinterestedness in Support of the Debtors' Application to Employ Todd Miller as Chief Executive Officer Nunc Pro Tunc to October 3, 2011 (the "Miller Employment Declaration").  Miller signed the declaration under penalty of perjury.

(a) <u>Miller's Misleading Description of His Relationship with Revival HHC</u>

165.    Miller stated that "[p]rior to my employment with the Debtors, I was the Chief Operating Officer of Revival [HHC]." (Miller Employment Declaration (¶ 1). He also stated that "[a]lthough I am currently employed by the Debtors, I still receive some benefits from Revival [HHC]." (<u>Id.</u>)

(i)    <u>Miller Continued to Be Employed and to Work for Revival HHC</u>

166.    In fact, at the time he submitted the Miller Employment Declaration, Miller had retained his position at Revival HHC. The Bankruptcy Court directed the appointment of an examiner to investigate the relationship between the Debtors and Revival HHC. Three days later, in a letter dated December 12, 2011, Todd Miller resigned his position with Revival HHC and asserted that his resignation would be "effective" as of December 1, 2011.

167.    In addition to remaining employed by Revival HHC and receiving salary and benefits, Todd Miller continued performing work for and was involved with Revival HHC. For example, during the fall of 2011, Todd Miller continued working on the following projects at Revival HHC:

- Reviewing and negotiating the legal fees from Nutovic and Associates submitted to Revival HHC on account of its work for Revival Funding.

- Handling problems relating to Revival HHC's accounts receivable system and addressing those problems with the vendor.

- Receiving regular updates on funds being received by Revival HHC and MetroStar from Medicaid and discussing the same with Revival HHC employees.

- Receiving from Revival HHC the legal bills submitted by Nixon Peabody as counsel to Revival HHC, which were addressed to Todd Miller as the responsible individual at Revival HHC.

- Receiving detailed reports showing the financial affairs of Revival HHC and the other enterprise entities (including Revival Funding) and following up regarding the same.

168.    In addition, Todd Miller retained and continued to use his Revival HHC email account.  Even after Todd Miller submitted his resignation letter, his email account was not shut off and he continued to use it for business purposes.

(ii)    Miller's Disclosure of Receiving "Some Benefits" from Revival HHC Was Materially Misleading

169.    Todd Miller's disclosure that he continued to receive "some benefits" from Revival HHC was materially misleading.  Todd Miller elaborated on those benefits elsewhere in the Miller Employment Declaration: "I continue to receive benefits in the form of expense reimbursement by Revival [HHC]."  In fact, Revival HHC was paying for significant benefits for Todd Miller, including Todd Miller's health insurance, airline tickets, utilities, meals, parking and his automobile.  Revival HHC was also paying rent for Miller's downtown Manhattan apartment.  Miller estimated that these payments had a value of over $125,000 a year.

170.    Isaac Soskin testified that Revival HHC was actually lending these funds, plus Miller's salary, to Todd Miller with the expectation that the Debtors would repay Revival HHC.  According to Soskin, Faye Zakheim explicitly approved this arrangement.  Such a loan from Revival HHC was never disclosed to the Bankruptcy Court.

171.    In addition, for two months while Todd Miller was employed by the Debtors and receiving a salary from Revival HHC, Todd Miller was transferring his paycheck from the Debtors to Steven Zakheim personally and in one instance to Revival HHC.

(iii)    <u>Miller Falsely Asserted that He Had No Connection with Other Creditors or Parties in Interest</u>

172.    Todd Miller understood that his relationship with Revival HHC was important to his employment application.  Elsewhere in his declaration, Todd Miller declared that he had no connection with the Debtors' creditors "or any other party with an actual or potential interest in these Chapter 11 Cases or their respective attorneys or other professionals," except that he was formerly employed as the Chief Operating Officer of Revival HHC, and he continued to receive expense reimbursement from Revival HHC.  This statement was false, misleading and/or incomplete.

173.    First, Todd Miller had not yet resigned from Revival HHC and was receiving a salary.

174.    Second, Todd Miller continued to hold executive positions with affiliates of Revival HHC.  For example, and all during the period that he served as chief executive officer of the Debtors:

- Todd Miller served as the chief executive officer of Ahava Home Care LLC d/b/a Revival Care, and signed a certification attesting that he had conducted an inventory of controlled substances.

- Todd Miller served as a member and a manager of New York Regional Dialysis, participated in the submission of a Certificate of Need to the DOH and the establishment of the dialysis center.

- Miller served as a manager, with Isaac Soskin, of NY Home Care Coalition Ltd., a political action committee, and NY Home Care PAC Ltd., a political advocacy coalition, both headquartered out of Revival HHC at 5350 Kings Highway, and was involved in the financial reporting for both entities.

- Todd Miller caused the Debtors to conduct business with a co-owner of New York Regional Dialysis, Abraham Klein/ Qualmax Supplies, who also had financial dealings with Steven Zakheim.

44

175.    Third, Todd Miller failed to disclose that he was the Chief Financial Officer of MetroStar.   According the NPI registry, Todd Miller is listed as the authorized official of MetroStar and its Chief Financial Officer.   Todd Miller caused the Debtors to pay higher prices to MetroStar than MetroStar requested and paid them more favorably than other vendors.

176.    Fourth, while Todd Miller was the chief executive of the Debtors, Todd Miller was involved with the lawyers for Revival Funding, the Debtors' secured creditor, and reviewed and negotiated their fees.   Todd Miller had repeated contact with Revival Funding's counsel regarding legal matters concerning the Debtors without the presence of Debtors' counsel.

4.   <u>Misleading Statements in Miller's Amended Employment Declaration</u>

177.    Three months later, on February 13, 2012, Miller submitted to the Bankruptcy Court an Amended Declaration of Disinterestedness in Support of Debtors' Application to Employ Todd Miller as Chief Executive Officer Nunc Pro Tunc to October 3, 2011 (the "<u>Miller Amended Employment Declaration</u>").   The impetus for the amended declaration was that on January 31, 2011 the Examiner had exposed some of the connections of Miller to Revival HHC. In other words, by the Miller Amended Employment Declaration, Miller was attempting to purify the record so as to obtain a favorable ruling on the final DIP motion.

178.    The Miller Amended Employment Declaration contained false statements and omitted material facts.

179.    First, Todd Miller finally disclosed the extent of the benefits he was receiving from  Revival HHC:  "While I was employed by the Debtors, I continued to receive healthcare, housing and expense reimbursement benefits from Revival through November 30, 2011. However, effective December 1, 2011, I resigned from my position with Revival and ceased

receiving any benefits from Revival." However, Todd Miller again failed to disclose that he had also been receiving salary from Revival HHC.

180. Second, Todd Miller failed to disclose that he was remitting his salary from the Debtors to Revival HHC and to Steven Zakheim personally.

181. Third, Todd Miller failed to disclose his previous (and apparent continuing) relationship with MetroStar.

182. Fourth, Todd Miller failed to disclose his continuing employment, involvement and/ or ownership interests in Revival Care, New York Regional Dialysis, MetroStar, the PAC and the political coalition.

183. Eager to dispel any doubt that Todd Miller was working for anyone other than the Debtors, the Miller Amended Employment Declaration stated "I am to be retained on a full time basis. In no case shall I serve as a director of any other entity while I am rendering services to the Debtors in these bankruptcy proceedings." That statement was false or misleading.

5. Misleading Statements in the Revival DIP Statement

184. On February 13, 2012, Revival Funding and Revival HHC filed a Statement in response to the Examiner's Report and in Further Support of Financing Motions (defined above as the Revival DIP Statement). Revival Funding submitted the Revival DIP Statement to convince the Bankruptcy Court that the Examiner had exonerated them and that the Final DIP Motion should be approved.

185. To this end the Revival DIP Statement stated that

> the Examiner's report accurately states that the Debtors and Revival have abandoned the earlier agreement in which the Debtors' boards of directors would have ceded operational authority and control. In several places in his report the Examiner affirms that the boards of directors of the Debtors are discharging

46

their fiduciary duties in overseeing the running of the Debtors'
operations by Todd Miller, a former COO of a Revival entity.  In
his Report, the Examiner further states that he found no evidence
of facts which would preclude Revival from being found as a good
faith lender in connection with the [Final DIP Motion], which is
pending before the Court.

(Revival DIP Statement, ¶ 1).  This statement was materially misleading because Revival

Funding and Revival HHC knew that Steven Zakheim had extensive control and involvement

with the Debtors, and that Todd Miller was conducting his duties as the Debtors' chief executive

as a lieutenant for Steven Zakheim.

186.    In addition, the Revival DIP Statement sought to "dispel any lingering concern"

that the Debtors' transactions with MetroStar "needed to be investigated further," (Id. at ¶ 2) by

addressing and characterizing those transactions for the Bankruptcy Court.  The Revival DIP

Statement asserted that "[v]irtually all of the goods supplied were ordered by [MetroStar] from

prior suppliers of Peninsula who refused to do business with Peninsula."  The same statement

was made in the Declaration of Isaac Newman, MetroStar's director of operations, attached to

the Revival DIP Statement.  This statement was misleading.

187.    In fact, both Steven Zakheim and Todd Miller were directing the purchasing

group at the Debtors to buy everything they could from MetroStar.  Newman knew this and

reminded the Debtors' purchasers of this fact repeatedly.  For example, on November 23, 2011,

Newman emailed Reisman and Gross:  "Steve Z wants us to sell to you guys he is busting my

chops.  Disposables and whatever else we can sell you."  Similarly, on October 24, 2011,

Newman emailed Reisman and Gross:  "You should only be buying from us unless I cannot get

an item."  Until he left to work at the Debtors, Reisman was a MetroStar employee, reporting to

Newman.

188.    In fact, at all times in the relationship between the Debtors and MetroStar, the Debtors paid MetroStar before MetroStar paid its own suppliers for the goods it had sold to the Debtors.   This occurred generally through Steven Zakheim and Todd Miller's control of the Debtors, and specifically through on-account payment, payment before invoices were generated, wire transfers in lieu of checks and a hand delivered check.   Steven Zakheim and Todd Miller's control guaranteed payment plus a 15% markup.

189.    Revival Funding, in the Revival DIP Statement, and Newman, in the accompanying declaration, also stated that "Unlike its margins for other customers, [MetroStar] has charged the Debtors only for its own costs plus a 15% charge for administrative, shipping and handling costs."   This statement omitted the fact that MetroStar's chief executive Steven Zakheim had offered the goods to the Debtors at a 10% markup but that Todd Miller, as the Debtors' chief executive, had instead insisted that the Debtors pay MetroStar more.   In fact, MetroStar had actually charged the Debtors approximately an 18% markup and had made a profit of $118,356 in just five months.

190.    Finally, far from 'dispelling lingering concern,' the Revival DIP Statement did not disclose the business which Todd Miller and Steven Zakheim were steering towards Revival HHC and MetroStar through the patient discharges.   Notably, the Revival DIP Statement omitted any discussion about Todd Miller's positions with other enterprise entities.

6.    Misleading Statements in Miller's DIP Declaration

191.    On February 13, 2012, Todd Miller submitted to the Bankruptcy Court a Declaration in Response to Objections and in Further Support of Debtors' Motion for Final DIP Financing (the "Miller DIP Declaration").   The Declaration was submitted under penalty of perjury.

48

192.    Todd Miller represented that the Debtors' boards of directors had considered three bona fide DIP funding proposals but selected Revival Funding's over the other two.  This statement was misleading because Miller knew that the other non-Zakheim suitors withdrew their proposals before the Debtors' boards had voted to approve the DIP Loan with Revival Funding.  In fact, the Debtors' board minutes indicate that the boards were told that the two other suitors had withdrawn their proposals from consideration before the boards voted to approve the DIP Loan with Revival Funding.

193.    Having affirmatively filed a document to support the approval of the DIP Loan, Todd Miller had an even greater obligation and an opportunity to reveal the many connections between him and Steven Zakheim, the Revival entities and the enterprise, in addition to the financial implications arising from that relationship.

7.    The Kaminski Employment Declaration

194.    On November 15, 2011, Michael Kaminski submitted a Declaration of Disinterestedness in Support of the Debtors' Application to Employ Michael Kaminski as Chief Restructuring Officer Nunc Pro Tunc to October 3, 2011 (the "Kaminski Employment Declaration").  Kaminski signed the declaration under penalty of perjury.  The Kaminski Employment Declaration contained misleading and incomplete statements.  Most importantly, Kaminski failed to disclose his connection to Steven Zakheim.

(a)    Kaminski Did Not Disclose that Zakheim Had Paid Him a $10,000 Bonus Through Revival HHC

195.    Kaminski stated that "[t]he precise terms of my employment, including compensation I will receive for provision of my services, are set forth in the Application. (Kaminski Employment Declaration ¶ 11). Paragraph 26 of the application described those

49

terms:  "the Debtors seek to compensate Mr. Kaminski for his services as CRO nunc pro tunc to his start date of October 3, 2011, in the amount of $30,000 per month ($360,000 per annum) and a one-time payment of $10,000 as a signing bonus."

196.    This statement was misleading because Steven Zakheim, through Revival HHC, paid Kaminski the $10,000 signing bonus and not the Debtors.  By email dated September 28, 201, Steven Zakheim promised Kaminski the bonus when Steven Zakheim hired him.  To this end, on October 3, 2011, Todd Miller instructed Zorach Donn to cut a check in the amount of $10,000 for Kaminki's bonus.  In response Donn asked Miller, "by the way, how do I code it?  Is this a company expense or is a Zakheim investment?"  Miller responded:  "Zakheim investment I believe."

197.    In addition, Kaminski stated that he did not "have any connection with the Debtors (other than in connection with these cases), their creditors, the Office of the United States Trustee, the Potential Parties in Interest, or any other party with an actual or potential interest in these Chapter 11 Cases…" (Kaminski Employment Declaration ¶ 14). This statement was false because Steven Zakheim, through Revival HHC, had paid Kaminski a $10,000 bonus.

(b) <u>Kaminski Failed to Disclose That Zakheim Gave Him His Credit Card to Use for Expenses</u>

198.    As described above, Kaminski stated that the "precise terms of my employment, including compensation" would be $30,000 a month plus a $10,000 signing bonus.  Kaminski also stated that he did not "have any connection with the Debtors (other than in connection with these cases), their creditors, the Office of the United States Trustee, the Potential Parties in Interest, or any other party with an actual or potential interest in these Chapter 11 Cases…" (Id. ¶ 14).

50

199.    These statements were false or misleading because, in addition, to these monies, Steven Zakheim had given Kaminski his credit card for Kaminski to pay for his expenses incurred while working at the Debtors.  Kaminski had expenses because he stayed at a hotel near the Debtors during weekdays throughout his employment with the Debtors.

(c)  <u>Kaminski Misrepresented that He Would be Employed by the Debtors, When in Fact the Debtors Were Contracting with an Affiliated Company for his Services</u>

200.    Kaminski applied to be employed by the Debtors as an officer who would be personally compensated with a salary.  In fact, the Debtors never issued Kaminski a paycheck and Kaminski was never an employee of the Debtors.  Instead, Kaminski submitted invoices from Reds' Dads Inc. ("<u>Reds' Dads</u>") to Miller for his $30,000 monthly salary and the Debtors paid the $30,000 in full without deducting any applicable taxes.

201.    Kaminski claims that Reds' Dads was a non-operating auto repair franchise and that he owns 100% of the shares and as serves as its President.  However, the invoices which Kaminski prepared and submitted to the Debtors for payment were submitted under the name of Carolyn Hoffman-Kaminski as President of Reds Dads.

202.    The Debtors paid a total of $93,775.05 to Reds' Dads.  In addition, the $10,000 signing bonus paid by Revival HHC was also paid to Reds' Dads and not directly to Kaminski.

203.    By not being truthful about the salary and bonus, Steven Zakheim and Revival HHC's involvement in Kaminski's hiring was not revealed.

## VIII.   <u>Steven Zakheim, Todd Miller and Revival Funding Coordinate to Mislead the Examiner</u>

204.    Steven Zakheim, Todd Miller and Revival Funding worked together to fend off the Examiner's investigation into the extent of Zakheim's control.   They coordinated the

response to the Examiner's requests and discussed that which the Examiner was unable to uncover.

205.    For example, on January 15, 2011, Nutovic emailed Steven Zakheim and Todd Miller (neither of whom was Nutovic's client) with detailed instructions regarding how the Revival entities and Todd Miller should respond to the Examiner's document request.

206.    On December 20, 2011, Nutovic emailed Steven Zakheim, Todd Miller and David Rabbach (Zakheim's longtime counsel) in advance of an upcoming phone call to plot the responses of Revival HHC and Todd Miller to the Examiner:

> Dealing with the examiner's requests.   Before he interviews Revival people or Faye or Steve, everyone should understand that he will be allowed to delve into who is running things currently at Revival.  Do you have a plan to deal with the DOH if the examiner makes a finding that Revival is being led by Steve? Or that Steve is not living up to his promise not to be involved with Revival business.

207.    After the Examiner had interviewed Faye Zakheim, Todd Miller emailed Isaac Nutovic as to David Rabbach's question as to whether the Examiner had uncovered the deal with Edison HHC for a recruitment center.  Todd Miller emailed:  "No one but me even knew about Edison."

### IX.    Miller's Incompetency as a Hospital CEO Led to the Closure of PHC

208.    Pursuant to Section 405.3 of the New York Code of Rules and Regulations ("NYCRR"), the daily management and operational affairs of a hospital "shall be the responsibility of the chief executive officer."  The same section enumerates specific duties and responsibilities of a hospital chief executive.

209.    The very first duty is (a) "The chief executive officer shall be responsible for the development, submission and implementation of all plans to correct operational deficiencies

52

identified by regulatory agencies on a timely basis and shall report to the governing body progress in developing and carrying out plans of correction."

210.    Thus, immediately upon taking over as CEO of the Debtors, Todd Miller was responsible for familiarizing himself with any deficiency reports, taking steps to correct them and reporting to the DOH any progress on carrying those plans out.

211.    To the extent Steven Zakheim was acting as the *de facto* chief executive officer of the Debtors for the reasons stated in Section III, A hereto, Steven Zakheim had the same responsibility.

212.    Todd Miller failed to take any meaningful steps to inquire about or become familiar with outstanding deficiency reports issued by the DOH, including the October 5, 2010 Laboratory Evaluation Report (the "2010 Deficiency Report") concerning deficiencies with the PHC laboratory.

213.    The 2010 Deficiency Report cited PHC with 33 violations of DOH's standards of practice, including

- Discrepancies on test results between patient reports and lab instrument printouts
- Lack of supervision and supervisory review
- Failure to monitor the temperature of the room storing sensitive chemicals
- Failure to maintain laboratory equipment, such as microscopes, blood bank timers and cell washers
- Failure to test reagents and using expired reagents
- Lack of inventory control for supplies
- Failure to maintain proper testing procedures

214.    When Todd Miller became employed at the Debtors, Miller failed to meet with Alan Corby, PHC's long time Vice President of Operations to discuss the status of the departments under Corby's jurisdiction, including the lab.  Nevertheless, Corby left a copy of the 2010 Deficiency Report on Miller's desk.

53

215.    Todd Miller subsequently marginalized Corby in favor of Zakheim appointees like Kaminski and Familusi.  At the end of November 2011, shortly after Corby announced his resignation, Kaminski told Miller and Familusi about the problems with the lab.  Familusi told Miller and Kaminski that "without the lab there is no hospital, and that we need to move very quickly and find somebody who can fix the problem."

216.    On December 3, 2011, Familusi asked a laboratory management company, Lenco Diagnostic Laboratories, Inc. ("Lenco"), to, as soon as possible, prepare a proposal to take over the PHC lab and to bring it into compliance with DOH health standards.  On December 14, 2011, Lenco provided Familusi with such a proposal which Familusi immediately shared with Miller.

217.    On December 15, 2011, Familusi warned Todd Miller about the increased urgency of fixing the problems at the lab.  Familusi sent Todd Miller an email with subject, "Lab confidential FYE Only" informing Miller that the previous survey deficiency had not been addressed and that they needed to move quickly in order to prevent closure by the DOH:

> DOH was in St Johns yesterday and almost closed their lab.  They are not allowed to give blood for transfusion, they have to go to Long beach hospital to get blood for transfusion.  They are hot on labs now.  We need to move quickly on this.  All the last survey deficiency has not been addressed. Will d/w you more later.

(emphasis added).

218.    Thereafter, Todd Miller authorized the commissioning of Analytical Diagnostic Laboratories, Inc. ("ADL") (a company run by Gershon Sontag, a close friend of Steven Zakheim) to write a report on the problems at the lab.  Familusi questioned Todd Miller as to why he would incur the cost and delay of generating a report when the Debtors already had the DOH deficiency report and already had received a proposal from Lenco to fix the lab.  Nevertheless, the Debtors commissioned ADL to write a report.

54

219.    On December 27, 2011, Sontag emailed a report on the PHC lab written by Dr. Jack Deutsch (the "Deutsch Report") to Miller and Familusi explicitly noting that their existed "sufficient grounds for the State to close the laboratory."  The Deutsch Report was based on Dr. Deutsch's direct observations of laboratory procedures, review of the 2010 deficiency survey and discussions with hospital administration.

220.    On December 31, 2011, Sontag emailed the Deutsch Report to Steven Zakheim. Subsequently, Sontag spoke with Steven Zakheim about the Deutsch Report to let him know that it was "serious."

221.    Like Lenco, Sontag quickly put together a proposal for ADL to take over and address the problems at the PHC lab.  Nevertheless, Steven Zakheim and Todd Miller continued to dither over addressing the lab problems.

222.    Steven Zakheim had already known about the lab problems before receiving the Deutsch report from Sontag on December 31st.  On December 29, 2011, Steven Zakheim emailed Familusi that he wanted Familusi to delay hiring someone to fix the lab until an associate of Zakheim's who "owns a lab and a bunch of nursing homes" could present a proposal to take over the lab.  Zakheim noted that the same individual "also wants to send patients to our hospital from his ten nursing homes. Of course there is no quid pro quo to either of these two subjects." Familusi responded: "I need to hear from him ASAP. The new folks are coming next week. Time is of essence.  We have too many issues at this time."

223.    The following week Steven Zakheim met with Shiel Medical Laboratory ("Shiel"), the lab owned by an individual who Steven Zakheim believed owned ten nursing homes.  Steven Zakheim personally handled the negotiations with Shiel over a proposal for Shiel to take over the PHC lab and bring it into compliance.  On January 5, 2012, after he had

55

negotiated a deal with Shiel, Steven Zakheim instructed Todd Miller to tell ADL to stand down because they had found someone at half the price.  Todd Miller complied.

224.    On January 30, 2012, David Masini, the Debtors' chief operating officer, contacted Sontag and told him that the Debtors wanted to engage ADL after all to solve the problems identified in the Deutsch report.  By then, Dr. Deutsch was on vacation and ADL did not arrive at the Debtors to begin addressing the lab problems until mid-February 2012.

225.    On February 21 and 22, 2012, the DOH, by its Wadsworth Center Clinical Laboratory Evaluation Program, conducted an on-site inspection of the PHC Lab.  On February 23, 2012, the DOH issued the Suspension Order after finding "serious deficiencies in the administration and operation relating to the clinical laboratory operation."  In large part, these deficiencies were the same deficiencies identified on the 2010 survey and the Deutsch Report.

226.    Todd Miller's failure to learn of and/or appreciate the seriousness of the lab problems until late November 2011, in non-compliance with basic regulations governing the duties of a hospital chief executive – plus his failure to take meaningful action to begin fixing the lab problems until three months later – led directly to the suspension of the lab and the DOH Orders.  Moreover, Steven Zakheim's meddling attempt to arrange for a lab whose owner could lead him to valuable business connections similarly delayed the attempt to address the lab problems for six weeks.

227.    When Todd Miller learned that the DOH was shutting the hospital he immediately emailed the news to Steven Zakheim.  Steven Zakheim responded:

"Can't we bribe any one?"

56

### The Claims

**FIRST CLAIM FOR RELIEF**

### RICO Section 1962(b)

**(Against Steven Zakheim)**

228.    Plaintiff realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

229.    The defendant to this claim is a person within the meaning of 18 U.S.C. § 1961(3).

230.    Steven Zakheim and the persons and businesses comprising his health care empire constitute an enterprise within the meaning of 18 U.S.C. §1961(4).

231.    The enterprise is engaged in activities which affect interstate commerce.

232.    Steven Zakheim acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity.  Specifically, among other things

- Fraudulently obtaining a Certificate of Need from the DOH for Revival HHC with which to (a) legally operate a home health care agency at Revival HHC and (b) obtain the right to receive payments from Medicare and Medicaid in violation of 18 U.S.C. § 1341.

- Applying for and obtaining permission to bill Medicare and Medicaid through the use of the certification obtained from New York State under fraudulent circumstances in violation of 18 U.S.C. § 1341 and 1343.

- Submitting requests for payment to Medicare and Medicaid in reliance upon the certification obtained under false pretenses, all while Steven Zakheim was operating Revival HHC in violation of 18 U.S.C. § 1341 and 1343.

- Knowingly participating in the fraudulent and false representations and pretenses made by Todd Miller to the DOH through the instrumentality of interstate wires to obtain consent for the DIP Loan in violation of 18 U.S.C. § 1343.

- Knowingly and fraudulently receiving Todd Miller's paychecks in violation of 18 U.S.C. § 152(5).

- Providing a $10,000 signing bonus to Kaminski's company, and paying his expenses, to facilitate his working as the Debtors chief restructuring officer in violation 18 U.S.C. § 152(6).

- Providing Todd Miller with a salary and benefits from Revival HHC for serving as the Debtors' executive in violation of 18 U.S.C. § 152(6).

233.    These acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

234.    Steven Zakheim has directly and indirectly acquired and maintained interests in and control of the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

235.    As a direct and proximate result of Steven Zakheim's racketeering activities and violations of 18 U.S.C. § 1962(b) and Steven Zakheim's efforts to maintain his control over the enterprise and Revival HHC and to acquire control over the Debtors, the Debtors and the Debtors' estates have been injured.  Specifically, and as described in detail above,

- The Debtors were caused to enter into pre- and post-petition financing, plus other undisclosed deals, under false circumstances to the detriment of the Debtors and their estates.  (Revival Funding is continuing to pursue its secured claims, having filed proofs of claim against the Debtors in July 2013 and a motion to deem their late filed claims timely.)

- Efforts to shop, negotiate or explore alternative financing options were neglected and sabotaged.

- An unqualified chief executive officer was installed to run the Debtors to protect and/or advance Steven Zakheim's interests, directly leading to the shutting down of the PHC Lab.

- The Debtors' estates were diluted through fraudulent transfers, unauthorized post-petition transfers and general waste, including the amounts incurred for hiring and dealing with the Examiner.

58

236.    As a result, the Debtors and the Debtors' Estates suffered actual damages in an amount to be determined at trial, but believed to be at least several million dollars.  Moreover, the Debtors and their estates are entitled to recover treble the damages sustained, plus costs of suit, including reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c).

### SECOND CLAIM FOR RELIEF

### RICO Section 1962(c)

**(Against Steven Zakheim and Isaac Soskin)**

237.    Plaintiff realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

238.    The defendants to this claim (the "Count II Defendants") all constitute persons within the meaning of 18 U.S.C. § 1961(3).

239.    The Count II Defendants are or were employed by or associated with the enterprise.

240.    The enterprise is engaged in activities affecting interstate commerce.

241.    The Count II Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity, specifically including, among other things:

- Fraudulently obtaining a Certificate of Need from the DOH for Revival HHC with which to (a) legally operate a home health care agency at Revival HHC and (b) obtain the right to receive payments from Medicare and Medicaid in violation of 18 U.S.C. § 1341.  (Steven Zakheim)

- Applying for and obtaining permission to bill Medicare and Medicaid through the use of the certification obtained from New York State under fraudulent circumstances in violation of 18 U.S.C. § 1341 and 1343.  (Steven Zakheim and Isaac Soskin)

59

- Submitting requests for payment to Medicare and Medicaid in reliance upon the certification obtained under false pretenses, all while Steven Zakheim was operating Revival HHC in violation of 18 U.S.C. § 1341 and 1343. (Steven Zakheim and Isaac Soskin)

- Knowingly participating in the fraudulent and false representations and pretenses made by Todd Miller to the DOH through the instrumentality of interstate wires to obtain consent for the DIP Loan in violation of 18 U.S.C. § 1343. (Steven Zakheim).

- Knowingly and fraudulently receiving Todd Miller's paychecks in violation of 18 U.S.C. § 152(5). (Steven Zakheim).

- Providing a $10,000 signing bonus to Kaminski's company, and paying his expenses, to facilitate his working as the Debtors chief restructuring officer in violation 18 U.S.C. § 152(6). (Steven Zakheim)

- Providing Todd Miller with a salary and benefits from Revival HHC for serving as the Debtors' executive in violation of 18 U.S.C. § 152(6). (Steven Zakheim).

- Knowingly and fraudulently making a false declaration in violation of 11 U.S.C. § 152(3). (Isaac Soskin).

242.    The acts listed above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

243.    The Count II Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

244.    As a direct and proximate result of the Count II Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), the Debtors and the Debtors' estates have been injured. Specifically, and as set forth in detail above:

- The Debtors were caused to enter into pre- and post-petition financing under false circumstances, plus other undisclosed deals, to the detriment of the Debtors and their estates.

- Efforts to shop, negotiate or explore alternative financing options were neglected and sabotaged.

- An unqualified chief executive officer was installed to run the Debtors to protect and/or advance Steven Zakheim's interests, which directly lead to the shutting down of the PHC Lab.

- The Debtors' estates were diluted through fraudulent transfers, unauthorized post-petition transfers and general waste, including the amounts incurred for hiring and dealing with the Examiner.

245.    As a result, the Debtors and the Debtors' Estates suffered actual damages in an amount to be determined at trial, but believed to be at least several million dollars.  Moreover, Debtors and their estates are entitled to recover treble the damages sustained, plus costs of suit, including reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c).

## THIRD CLAIM FOR RELIEF

## RICO Section 1962(d)

**(Against Steven Zakheim, Faye Zakheim, Todd Miller, Isaac Soskin, Ari Weiss, Revival Funding, Revival Acquisition, Revival HHC, MetroStar and Ganzel LLC)**

246.    Plaintiff realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

247.    The defendants to this claim (the "Count III Defendants") all constitute persons within the meaning of 18 U.S.C. § 1961(3).

248.    As set forth above, the Count III Defendants agreed and conspired to violate 18 U.S.C. § 1962(b) and (c).  Specifically, they agreed to and conspired to conduct all of the acts described in the First Claim for Relief and the Second Claim for Relief, as enumerated above.

249.    The Count III Defendants have intentionally conspired and agreed to acquire and maintain interests in the enterprise through a pattern of racketeering activity and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

250.    Among other things, each Count III defendant took an overt act in furtherance of

the conspiracy:

- Steven Zakheim performed the acts discussed herein.
- Faye Zakheim signed a false affidavit to the DOH, became the sole shareholder of Revival HHC, became the sole member of Revival Funding and Revival Acquisition and sat for an interview with the Examiner.
- Isaac Soskin served as the chief executive officer of Revival HHC, Revival Funding and Revival Acquisition and submitted a false declaration to the Bankruptcy Court.
- Todd Miller acted as the Debtors' chief executive officer.
- Ari Weiss engineered the $50,000 payment to MetroStar on the eve of the Consent/ Petition.
- Revival Funding entered into financial transactions with the Debtors.
- Revival Acquisition entered into the September 1 Agreement.
- Revival HHC provided compensation to Todd Miller while he was the chief executive officer of the Debtors and installed employees at the Debtors, including Miriam Gersh.
- MetroStar entered into transactions with the Debtors and sold equipment to patients discharged from the Debtors.
- Ganzel LLC was used by Steven Zakheim and Zorach Donn to direct the enterprise's finances.

251.    As a direct and proximate result of the Count III Defendants' conspiracy, the

overt acts taken in furtherance of that conspiracy and in violation of 18 U.S.C. § 1962(d), the

Debtors and the Debtors' estates have been injured.  Specifically, and as set forth in detail above,

- The Debtors were caused to enter into pre- and post-petition financing under false circumstances, plus other undisclosed deals, to the detriment of the Debtors and their estates.

- Efforts to shop, negotiate or explore alternative financing options were neglected and sabotaged.

- An unqualified chief executive officer was installed to run the Debtors to protect and/or advance Steven Zakheim's interests, directly leading to the shutting down of the PHC Lab.

- The Debtors estates were diluted through fraudulent transfers, unauthorized post-petition transfers and general waste, including the amounts incurred for hiring and dealing with the Examiner.

252. By reason of the above acts, the Debtors and their estates suffered actual damages in an amount to be determined at trial, but believed to be at least several million dollars. The Debtors and their estates are entitled to recover treble the damages sustained, plus costs of suit, including reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c).

### FOURTH CLAIM FOR RELIEF

### Fraud on the Court

**(Against Steven Zakheim, Todd Miller, Isaac Soskin, Revival Funding, Revival Acquisition and Revival HHC)**

253. Plaintiff realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

254. The Trustee seeks to vacate the Final DIP Order as a result of fraud on the Bankruptcy Court pursuant to 11 U.S.C. § 105(a) and Rule 60(d)(3) of the Federal Rule of Civil Procedure, made applicable here by Rule 9024 of the Federal Rules of Bankruptcy Procedure.

255. The Defendants prevented the Bankruptcy Court from effectively overseeing the Debtors' Chapter 11 cases by making, or causing to be made, misrepresentations to the Bankruptcy Court (or by having such misrepresentations be made on their behalf), by eviscerating any distinction between the management of the Debtors and the secured post-petition lender, and by entering into undisclosed deals indebting the Debtors to the Zakheim enterprise. The Defendants' fraudulent conduct seriously undermined and impaired the integrity of the normal process of adjudicating issues in a Chapter 11 case.

256. The fraud was perpetrated by Todd Miller, Isaac Soskin, Revival Funding, Revival Acquisition and Michael Kaminski, with the full knowledge and at the behest of Steven Zakheim. As a result of the actions of the Count IV Defendants, the Bankruptcy Court did not

have the true and complete facts when the Court approved the retention of professionals, approved the appointment of the Examiner, approved the Interim DIP Order and approved the Final DIP Order.

257.    Moreover, because of the secured lender's control over the Debtors' management, the Bankruptcy Court was deprived of true litigants with adverse interests presenting competing arguments and defending their own interests.

258.    In approving the Interim and Final DIP orders, the Bankruptcy Court relied upon the representations which were presented to it.  Had the Bankruptcy Court had the true and complete facts, the Bankruptcy Court would have never approved the Interim or the Final DIP Orders.  Among other things, those facts included that,

- Todd Miller took his direction from Steven Zakheim, the true secured lender, in connection with his position as the Debtors' chief executive officer.

- Todd Miller was transferring his paychecks from the Debtors to Steven Zakheim.

- Todd Miller, as the Debtors' chief executive officer, but acting as an agent for Revival Funding and Steven Zakheim, sabotaged efforts to obtain DIP financing on other terms.

- Todd Miller continued to serve and function as an officer for entities relating to Steven Zakheim, including:  Revival HHC, Revival Care, MetroStar, New York Regional Dialysis, New York Home Care PAC, Ltd. and New York Home Care Coalition, Ltd.

- Todd Miller reviewed and negotiated the legal fees of counsel to Revival Funding

- Under Todd Miller's leadership, the Debtors paid over $1.3 million to Steven Zakheim and his enterprise, and expended substantial additional sums on, for example, public relations, for the benefit of Zakheim's enterprise.

- Todd Miller caused the Debtors to grant numerous additional benefits to the Zakheim enterprise, including to Steven Zakheim, Revival HHC, MetroStar and Edison HHC.

- Todd Miller, with the knowledge of Steven Zakheim and Revival Funding, lied to or seriously misled the DOH for the purpose of consummating the DIP Loan.

- Isaac Soskin filed an affidavit falsely claiming that the funds paid by the secured lender to the Debtors' professionals were loans to the Debtors.

259.    Moreover, the DIP Loan was not negotiated in good faith and at arm's length. The DIP Loan was principally negotiated between Todd Miller, reporting to Steven Zakheim, and Steven Zakheim, controlling Revival Funding.  Revival Funding's lawyer reported to both Steven Zakheim and Todd Miller.  This was bad faith.

260.    Therefore, the Trustee seeks to vacate the Final DIP Order as a fraud on this Court and to recover damages, including punitive damages, and attorney's fees from the Defendants, in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### Vacatur of Final DIP Order Pursuant to Rule 60(d)(1)

**(Against Steven Zakheim, Todd Miller, Isaac Soskin, Revival Funding, Revival Acquisition and Revival HHC)**

261.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

262.    The Trustee seeks to relieve the Debtors' estates from the Final DIP Order to prevent a grave miscarriage of justice pursuant to 11 U.S.C. § 105(a) and Rule 60(d)(1) of the Federal Rules of Civil Procedure, made applicable here by Bankruptcy Rule 9024.

263.    Allowing the Final DIP Order to stand would endorse the fraudulent acts undertaken by the Zakheim enterprise and would result in a grave miscarriage of justice vis-à-vis the Debtors' and the Debtors' estates.  The Final DIP Order should not, in good conscience, be enforced.

264.    The Debtors and the Debtors' estates have no other available or adequate remedy.

265.    Good reasons exist for the Bankruptcy Court to have denied the Final DIP Order.

266.    The Zakheim enterprise's fraud prevented the Debtors, the Debtors' estates and parties in interest from adequately contesting the Final DIP Order.

267.    The Debtors' estates and the Trustee were free from any fault.

268.    Therefore, the Trustee seeks to vacate the Final DIP Order.

**SIXTH CLAIM FOR RELIEF**

**<u>Fraud on the Debtors and the Debtors' Estates</u>**

**(Against Steven Zakheim, Faye Zakheim, Todd Miller, Isaac Soskin, Revival Funding, Revival Acquisition and Revival HHC)**

269.    The Trustee repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth again herein.

270.    Each of the defendants to this claim made or caused to be made misrepresentations including:  the lack of distinction between the management of the Debtors and the secured post-petition lender, the phantom loans indebting the Debtors to the Zakheim enterprise, the sabotage of efforts to obtain DIP financing on other terms, the fairness and reasonableness of the Revival Funding DIP Loan, the undisclosed side deals between the Zakheim enterprise and the Debtors, including: (1) the transfer of Todd Miller's paychecks to Steven Zakheim and Revival HHC; (2); the intention to have the Debtors repay Revival HHC for Revival HHC's payment of salary and benefits to Todd Miller;  (3) the directing of home health care and home equipment purchases to MetroStar and Revival HHC; (4) the deal to insert Edison HHC at the Debtors; (5) the undisclosed payments to Senior Script; (6) the payroll being paid to Zakheim enterprise employees – all of which served to mask the true terms under which Steven

Zakheim was lending to the Debtors.

271.    The Debtors' estates, the Debtors' creditors and other parties in interest, justifiably relied on the false representations.

272.    Had they known the true story they would not have allowed the Zakheim enterprise to take over the Debtors and enter into the DIP Loan with Revival Funding.

273.    As a direct and proximate cause of the above acts, the Debtors and their estates suffered actual damages in an amount to be determined at trial, but believed to be at least several million dollars, plus punitive damages.

**SEVENTH CLAIM FOR RELIEF**

**<u>Fraudulent Concealment</u>**

**(Against Steve Zakheim, Faye Zakheim, Isaac Soskin, Todd Miller and Revival Funding)**

274.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

275.    Each of the defendants to this claim had a duty, by virtue of their positions with and interests in the secured lender and the Debtors and by virtue of their statements submitted by them or on their behalf to the Bankruptcy Court, to disclose to the Bankruptcy Court and to the Debtors their knowledge of the material facts concerning the DIP Order, Todd Miller's employment and Steven Zakheim's and his various entities' relationship to the Debtors, to wit, among other things:

the misrepresentations to the Bankruptcy Court, the lack of distinction between the management of the Debtors and the secured post-petition lender, the undisclosed loans indebting the Debtors to the Zakheim enterprise, the sabotage of efforts to obtain DIP financing on other terms, the fairness and reasonableness of the Revival Funding DIP

Loan, the undisclosed side deals between the Zakheim enterprise and the Debtors, including: (a) Todd Miller's continued involvement with the Zakheim entities; (b) the transfer of Todd Miller's paychecks to Steven Zakheim and Revival HHC; (c) the intention to have the Debtors repay Revival HHC for Revival HHC's payment of salary and benefits to Todd Miller; (d) the directing of home health care and home equipment purchases to MetroStar and Revival HHC; (e) the deal to insert Edison HHC at the Debtors; (f) the payments to Senior Script; (g) the payroll being paid to Zakheim enterprise employees – all of which served to mask the true terms under which the Steven Zakheim was lending to the Debtors.

276.    Nevertheless, despite ample opportunity to do so, none of the Defendants disclosed those material facts and specifically chose not to do so as to conceal the acts described herein undertaken for the benefit of Steven Zakheim and the entities which he owned and/or controlled.

277.    Had the Bankruptcy Court, the Debtors or their creditors been apprised of these specific facts, the Interim and Final DIP Orders would never have been approved, the control of the Debtors would not have resided with Steven Zakheim, and the Debtors would not have made the transfers and incurred the indebtedness to the Zakheim enterprise discussed herein.  The Debtors' estates have suffered damages by the acts set forth above in an amount to be proven at trial, but believed to be at least several million dollars.

## EIGHTH CLAIM FOR RELIEF

## Equitable Subordination of All Claims Asserted by Revival Funding

### (Against Revival Funding)

278.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

279.    The Trustee seeks to equitably subordinate all claims asserted by Revival Funding against the Debtors and their estates pursuant to 11 U.S.C. §§ 105(a) and 510(c) because Revival Funding in engaged in inequitable conduct, causing injury to the creditors of the Debtors' estates and conferring an unfair advantage on Revival Funding.    Equitable subordination here is consistent with the Bankruptcy Code.

280.    Revival Funding and its true stakeholders engaged in inequitable conduct by causing false and fraudulent statements to be filed with the Bankruptcy Court to hide the true involvement of Steven Zakheim and his businesses and controlled the Debtor for the benefit of Steven Zakheim and his affiliated entities.    Todd Miller, the putative chief executive of the Debtors, was working on behalf of Revival Funding and Steven Zakheim to the detriment of and in breach of Todd Miller's fiduciary obligations to the Debtors and their estates.    Moreover, Todd Miller, on behalf of Revival Funding and Steven Zakheim, and with the full knowledge of Revival Funding and Steven Zakheim, lied to or seriously misled the DOH for the purpose of obtaining an encumbrance on the Debtors' property.

281.    The defendants' conduct injured the Debtors' estates by, among other things, (i) preventing the Debtors from competitively shopping the DIP Loan, (ii) controlling PHC in such a manner that it was effectively shut down by the DOH for gross mismanagement and incompetence, (iii) causing the Debtors to borrow funds  under the DIP Loan, with the associated

interest and fees, which allowed the Debtors to pay entities in the Steven Zakheim enterprise, (iv) causing the Debtors to make unauthorized and fraudulent transfers of property and (v) generally wasting the Debtors' assets.

282.    In these circumstances, subordinating Revival Funding's claims are consistent with the provisions of the Bankruptcy Code.

283.    Therefore, the Trustee requests that the claims asserted by Revival Funding be subordinated to a class below pre-petition, general unsecured claims.

## NINTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty of Care Owed to the Debtors and to the Debtors' Estates

### (Against Todd Miller)

284.    Plaintiff realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

285.    Todd Miller, as the chief restructuring and chief executive officer of the Debtors, was required to discharge the duties of his office with the care that an ordinarily prudent person in a like position would exercise under similar circumstances.

286.    By committing the acts and omissions set forth above, Todd Miller breached his duty of care owed to the Debtors.  Those acts included, *inter alia*,

- Submitting false, misleading and incomplete statements to the Bankruptcy Court;
- Failing to maintain the PHC Lab in compliance with DOH standards;
- Failing to promptly take steps to remedy deficiencies with the PHC Lab;
- Failing to aggressively shop and negotiate the most beneficial pre- and post-petition financing options;
- Drawing paychecks from the Debtors and then transferring them to Revival HHC and Steven Zakheim;
- Sharing patient data with Steven Zakheim and directing patients to Steven Zakheim's businesses;
- Directing business deals to Zakheim enterprise businesses, without competitively shopping them, and granting other benefits to the Zakheim enterprise;

- Failing to negotiate better terms with the Zakheim enterprise for any goods or services actually provided;
- Causing expedited and on-account payment to the Zakheim enterprise on the eve of bankruptcy;
- Ensuring that Steven Zakheim's businesses, family member and business partners were paid, and under favorable terms, when other creditors were not getting paid;
- Causing the Debtors to needlessly spend money to hide Steven Zakheim's involvement and/ or the true relationship between the Debtors and Revival Funding;
- Submitting false and misleading statements to the DOH.

287.    In addition, Todd Miller breached his fiduciary duties owed to the Debtors' estates by failing to disclose to the Debtors' creditors all facts and circumstances regarding the Zakheim enterprise's dealings and intentions vis-à-vis the Debtors, so that the creditors, as the beneficiaries of the estates, could deal on even terms.

288.    As a direct and proximate cause of Miller's breach of the duty of care, the Debtors' estates have suffered damages in an amount to be proven at trial, but believed to be at least several million dollars consisting of, *inter alia*, costs flowing from the abrupt shutdown of PHC due to the DOH Orders, including the increased costs as compared to a managed closure; the heightened costs of administering the Chapter 11 estates; the amounts needlessly spent to hide Steven Zakheim's involvement, including the costs of the Examiner; the failure to negotiate more favorable financing; and the amounts transferred and benefits provided to Steven Zakheim and his enterprise, plus punitive damages.

### TENTH CLAIM FOR RELIEF

### Breach of the Duty of Loyalty and Good Faith Owed to the Debtors and to the Debtors' Estates

### (Against Todd Miller)

289.    Plaintiff realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

290.    An officer of a corporation must act with the utmost loyalty to and in the best interest of the corporation.

291.    While he served as chief restructuring and chief executive officer of the Debtors, Todd Miller owed an undivided duty of loyalty to the Debtors.

292.    Todd Miller breached his duty of loyalty to the Debtors by committing the acts and omissions set forth herein, including, *inter alia*:

- Submitting false, misleading and incomplete statements to the Bankruptcy Court;
- Failing to maintain the PHC Lab in compliance with DOH standards;
- Failing to promptly take steps to remedy any deficiencies with the PHC Lab;
- Failing to aggressively shop and negotiate the most beneficial pre- and post-petition financing options;
- Drawing paychecks from the Debtors and then transferring them to Revival HHC and Steven Zakheim;
- Sharing patient data with Steven Zakheim and directing patients to Zakheim's businesses;
- Directing business deals to Zakheim enterprise businesses, without competitively shopping them, and granting other benefits to the Zakheim enterprise;
- Failing to negotiate better terms with the Zakheim enterprise for any goods or services actually provided;
- Causing expedited and on-account payment to the Zakheim enterprise on the eve of bankruptcy;
- Ensuring that Steven Zakheim's businesses, family member and business partners were paid, and under favorable terms, when other creditors were not getting paid;
- Causing the Debtors to needlessly spend money to hide Steven Zakheim's involvement and/ or the true relationship between the Debtors and Revival Funding;
- Submitting false and misleading statements to the DOH.

293.    In addition, Miller breached his fiduciary duties owed to the Debtors' estates by failing to disclose to the Debtors' creditors all facts and circumstances regarding the Zakheim enterprise's dealings and intentions vis-à-vis the Debtors, so that the creditors, as the beneficiaries of the estates, could deal on even terms.

294.    In addition, the Debtors paid at least $259,946.67 to Todd Miller in connection with his services as chief restructuring and chief executive officer of the Debtors.  Therefore,

Todd Miller should be required to disgorge, and the Trustee to recover on behalf of the Debtors and the Debtors' estates, at least $259,946.67 from Todd Miller.

295.    As a direct and proximate cause of Miller's breach of the duty of care, the Debtors' estates have suffered damages in an amount to be proven at trial, but believed to be at least several million dollars consisting of, *inter alia*, costs flowing from the abrupt shutdown of PHC due to the DOH Orders, included the increased costs as compared to a managed closure; the heightened costs of administering the Chapter 11 estates; the amounts needlessly spent to hide Steven Zakheim's involvement, including the costs of the Examiner; the failure to negotiate more favorable financing; and the amounts transferred and benefits provided to Steven Zakheim and his enterprise, plus punitive damages.

## ELEVENTH CLAIM FOR RELIEF

### Aiding and Abetting Breach of Fiduciary Duty

### (Against Steven Zakheim and Ari Weiss)

296.    Plaintiff realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

297.    As discussed above, Todd Miller breached the fiduciary duties which he owed to the Debtors and the to the Debtors' estates.

298.    Steven Zakheim and Ari Weiss had actual knowledge of those breaches.

299.    Steven Zakheim knowingly induced Todd Miller and participated in Todd Miller's breach of his fiduciary duties to both the Debtors and the Debtors' estates.

300.    Ari Weiss participated in Todd Miller's breach of breach of fiduciary duties to both the Debtors and the Debtors' estates, by among things, engineering the on-account payment to MetroStar on the eve of the Consent/ Petition and directing the Debtors' purchasing and

contracting even though he had no position with the Debtors for the purpose of facilitating Steven Zakheim's control over the Debtors.

301.    As a direct and proximate cause of the breach of the fiduciary duties to the Debtors' estates, the Debtors' estates have suffered damages in an amount to be proven at trial consisting of *inter alia*, the costs flowing from the abrupt shutdown of PHC due to the DOH Orders, including the increased costs as compared to a managed closure;  the heightened costs of administering the Chapter 11 estates; the amounts needlessly spent to hide Steven Zakheim's involvement, including the costs of the Examiner; the failure to negotiate more favorable financing; and the amounts transferred and benefits provided to Steven Zakheim and his enterprise, plus punitive damages.

## TWELFTH CLAIM FOR RELIEF

### Negligent Hiring, Retention and Supervision of Todd Miller

**(Against Steven Zakheim, Faye Zakheim, Isaac Soskin, Revival HHC, Revival Funding and Revival Acquisition)**

302.    Plaintiff realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

303.    At all times relevant hereto, Todd Miller served as the agent and/ or employee of Steven Zakheim, Faye Zakheim, Isaac Soskin, Revival HHC, Revival Funding and Revival Acquisition.

304.    Each of the defendants to this claim for relief knew two things:  (a) that Todd Miller was not qualified for the positions of chief restructuring officer and chief executive officer of the Debtors and (b) that Todd Miller was not disinterested to serve as the chief officer of the Debtors as debtors-in-possession in a Chapter 11 case.

305.    Despite such knowledge, they caused Todd Miller to be installed as an executive at the Debtors.

306.    As a reasonably forseeable result, Todd Miller failed to perform in the manner that a qualified, prudent, reasonable and disinterested executive would have performed in such circumstances.  Those failings included, *inter alia*,

- Submitting false, misleading and incomplete statements to the Bankruptcy Court;
- Failing to maintain the PHC Lab in compliance with DOH standards;
- Failing to promptly take steps to remedy deficiencies with the PHC Lab;
- Failing to aggressively shop and negotiate the most beneficial pre- and post-petition financing options;
- Drawing paychecks from the Debtors and then transferring them to Revival HHC and Steven Zakheim;
- Sharing patient data with Steven Zakheim and directing patients to Zakheim's businesses;
- Directing business deals to Zakheim enterprise businesses, without competitively shopping them, and granting other benefits to the Zakheim enterprise;
- Failing to negotiate better terms with the Zakheim enterprise for any goods or services actually provided;
- Causing expedited and on-account payment to the Zakheim enterprise on the eve of bankruptcy;
- Ensuring that Steven Zakheim's businesses, family member and business partners were paid, and under favorable terms, when other creditors were not getting paid;
- Causing the Debtors to needlessly spend money to hide Steven Zakheim's involvement and/ or the true relationship between the Debtors and Revival Funding;
- Submitting false and misleading statements to the DOH;
- Failing to disclose to the Debtors' creditors all facts and circumstances regarding the Zakheim enterprise's dealings and intentions vis-à-vis the Debtors, so that the creditors, as the beneficiaries of the estates, could deal on even terms.

307.    Despite an ability to supervise Todd Miller, the defendants to this claim failed to supervise Todd Miller to prevent him from performing in the manner discussed above.

308.    As a direct and proximate cause of their negligent hiring, retention and supervision of Todd Miller, the Debtors' estates have suffered damages in an amount believed to be at least several million dollars.

## THIRTEENTH CLAIM FOR RELIEF

### Respondeat Superior

**(Against Steven Zakheim, Faye Zakheim, Isaac Soskin, Revival HHC, Revival Funding and Revival Acquisition)**

309.     Plaintiff realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

310.     At all times relevant hereto, Todd Miller served as the agent and/ or employee of Steven Zakheim, Faye Zakheim, Isaac Soskin, Revival HHC, Revival Funding and Revival Acquisition.

311.     Todd Miller failed to perform in the manner that a qualified, prudent, reasonable and disinterested executive would have performed in such circumstances.   Those failings included, *inter alia*,

- Submitting false, misleading and incomplete statements to the Bankruptcy Court;
- Failing to maintain the PHC Lab in compliance with DOH standards;
- Failing to promptly take steps to remedy deficiencies with the PHC Lab;
- Failing to aggressively shop and negotiate the most beneficial pre- and post-petition financing options;
- Drawing paychecks from the Debtors and then transferring them to Revival HHC and Steven Zakheim;
- Sharing patient data with Steven Zakheim and directing patients to Zakheim's businesses;
- Directing business deals to Zakheim enterprise businesses, without competitively shopping them, and granting other benefits to the Zakheim enterprise;
- Failing to negotiate better terms with the Zakheim enterprise for any goods or services actually provided;
- Causing expedited and on-account payment to the Zakheim enterprise on the eve of bankruptcy;
- Ensuring that Steven Zakheim's businesses, family members and business partners were paid, and under favorable terms, when other creditors were not getting paid;
- Causing the Debtors to needlessly spend money to hide Steven Zakheim's involvement and/ or the true relationship between the Debtors and Revival Funding;
- Submitting false and misleading statements to the DOH;

- Failing to disclose to the Debtors' creditors all facts and circumstances regarding the Zakheim enterprise's dealings and intentions vis-à-vis the Debtors, so that the creditors, as the beneficiaries of the estates, could deal on even terms.

312.    Todd Miller's actions and omissions occurred within the scope of his agency and/or employment by the defendants to this claim as he was serving their interests during his tenure at the Debtors.

313.    As a direct and proximate cause of Todd Miller's negligence, the Debtors' estates have suffered damages in an amount believed to be at least several million dollars.

## FOURTEENTH CLAIM FOR RELIEF

### Unauthorized Post-Petition Transfers

**(Against Steve Zakheim, MetroStar, Revival HHC, Revival Funding, Senior Script and Revival Pharmacy LLC)**

314.    Plaintiff realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

315.    After the date of PHC's involuntary petition, PHC made transfers to the following defendants, including:

| Transfer | Clearance Date | Amount | Recipient |
|----------|----------------|--------|-----------|
| Wire Transfer | September 19, 2011 | $50,000.00 | MetroStar |
| Wire Transfer | October 6, 2011 | $20,176.11 | MetroStar |
| Check No. 7426 | October 13, 2011 | $44,686.92 | MetroStar |
| Wire Transfer | October 25, 2011 | $20,432.53 | MetroStar |
| Check No. 7550 | October 27, 2011 | $33,011.43 | MetroStar |
| Check No. 7652 | November 3, 2011 | $121,392.44 | MetroStar |
| Check No. 7724 | November 10, 2011 | $106,569.91 | MetroStar |
| Check No. 7794 | November 17, 2011 | $96,228.04 | MetroStar |
| Check No. 7861 | November 23, 2011 | $15,376.83 | MetroStar |
| Check No. 7934 | December 1, 2011 | $54,014.80 | MetroStar |
| Check No. 8108 | December 15, 2011 | $34,074.67 | MetroStar |
| Check No. 8225 | December 23, 2011 | $9,429.64 | MetroStar |
| Check No. 10064 | January 6, 2012 | $4,436.51 | MetroStar |
| Check No. 10747 | February 29, 2012 | $4,743.85 | MetroStar |

| Check No. 10804 | March 5, 2012 | $7,864.25 | MetroStar |
| Check No. 10804 | March 5, 2012 | $737.12 | MetroStar |
| Check No. 8031 | October 5, 2011 | $6,937.32 | Revival HHC |
| Check No. 1015 | November 10, 2011 | $23,425.00 | Revival HHC |
| Check No. 1022 | December 8, 2011 | $11,550.00 | Revival HHC |
| Wire Transfer | November 8, 2011 | $30,000.00 | Senior Script |
| Wire Transfer | November 14, 2011 | $57,035.11 | Senior Script |
| Wire Transfer | November 23, 2011 | $43,169.78 | Senior Script |
| Wire Transfer | November 30, 2011 | $13,220.96 | Senior Script |
| Check No. 7494 | October 20, 2011 | $49,941.74 | Senior Script |
| Check No. 7573 | October 27, 2011 | $20,491.57 | Senior Script |
| Check No. 8032 | November 10, 2011 | $7,984.68 | Steven Zakheim |
| Check No. 50931 | November 2, 2011 | $7,984.69 | Steven Zakheim |
| Check No. 50710 | November 2, 2011 | $7,984.68 | Steven Zakheim |

316.    After the date of filing of PGN's petition for Chapter 11, PGN made transfers to the following defendants, including:

| **Transfer** | **Clearance or Recording Date** | **Amount** | **Recipient** |
| --- | --- | --- | --- |
| Real Property Mortgage | September 23, 2011 | $1.5 million | Revival Funding |
| Check No. 9854 | October 13, 2011 | $225.92 | MetroStar |
| Check No. 9886 | October 27, 2011 | $934.80 | MetroStar |
| Check No. 9907 | November 3, 2011 | $3,662.99 | MetroStar |
| Check No. 9932 | November 10, 2011 | $2,819.94 | MetroStar |
| Check No. 9958 | November 17, 2011 | $2,349.50 | MetroStar |
| Check No. 10044 | December 15, 2011 | $7,067.00 | MetroStar |
| Check No. 10059 | December 22, 2011 | $20.00 | MetroStar |
| Check No. 10092 | December 29, 2011 | $3,062.20 | MetroStar |
| Check No. 80187 | February 29, 2012 | $2,960.00 | MetroStar |

317.    Each of these transfers were property of either PHC's or PGN's estate that were not authorized by the Bankruptcy Code or the Bankruptcy Court.

78

318. The defendants to this claim were the initial transferees of these transfers, or the immediate or mediate transferees of such initial transferee of the person for whose benefit the transfers were made. Revival Pharmacy LLC is the successor to Senior Script.

319. Pursuant to Bankruptcy Code § 549, the Trustee may avoid a transfer of property of the estate that was made after the commencement of the case and which was not authorized by the Bankruptcy Code or the Court.

320. By reason of the foregoing, these transfers are avoidable under Bankruptcy Code § 549(a).

321. Pursuant to Bankruptcy Code § 550(a), the recovery of property for the benefit of PHC's estate is authorized to the extent avoided under Bankruptcy Code § 549.

## FIFTEENTH CLAIM FOR RELIEF

### Objection to Claims, Liens and Security Interests Asserted by Revival Funding

### (Against Revival Funding)

322. Plaintiff realleges and incorporates the allegations of the preceding paragraphs as if fully set forth.

323. Plaintiff objects to the claims and liens asserted by Revival Funding

(a) pursuant to 11 U.S.C. § 502(d)

(b) because Revival Funding's failed to record its mortgage of PGN's real property prior to PGN filing its Chapter 11 petition;

(c) because Revival Funding failed to give adequate consideration for its asserted security interests;

(d) because Revival Funding failed to timely file its claims; and

(e) because they are subject to setoff.

79

## SIXTEENTH CLAIM FOR RELIEF

### Fraudulent Transfer Under the Bankruptcy Code of Security Interest in PGN

### (Against Revival Funding)

324.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

325.    On September 2 and 8, 2011, PGN purportedly transferred a $250,000 security interest in all of its assets to Revival Funding (the "250,000 Security Interest").

326.    On September 15, 2011, PGN purportedly transferred a $1.5 million security interest in all of its assets to Revival Funding (the "$1.5 Million Security Interest").

327.    The $250,000 Security Interest and the $1.5 Million Security Interest were made with actual intent to hinder, delay and defraud the creditors of PGN by obtaining a pre-petition security interest with which Steven Zakheim could use to control the Debtors to the detriment of the Debtors' creditors.

328.    Therefore, the Trustee seeks to avoid the transfer of the $250,000 Security Interest and the $1.5 Million Security Interest to Revival Funding as a fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(A).

## SEVENTEENTH CLAIM FOR RELIEF

### Unjust Enrichment

### (Against Steven Zakheim, Faye Zakheim, Todd Miller, Isaac Soskin, Ari Weiss, Edison HHC, Revival HHC, MetroStar, Senior Script and Revival Pharmacy LLC)

329.    The Trustee repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth again herein.

330.    Each of the defendants to this claim were enriched at the expense of the Debtors

80

and their estates and equity and good conscience militate against permitting them to retain those

benefits.

331.    The Trustee seeks to recover all benefits, including monies, directly or indirectly

received by the defendants to this claim, including but not limited to:

(a)    all payments received by Steven Zakheim and Revival HHC from Todd Miller
while Todd Miller was serving as an officer of the Debtors;

(b)    all payments received from the Debtors by Revival HHC, MetroStar, Senior
Script and Revival Pharmacy LLC ( in its own right or as successor to Senior Script);

(c)    all benefits, including unpaid rent, received by Edison HHC from the Debtors for
implementing a recruitment center at the Debtors;

(d)    all payments and benefits received by Todd Miller in connection with work at the
Debtors;

(e)    all payments and benefits indirectly received from the Debtors by Steven
Zakheim, Faye Zakheim, Isaac Soskin and Ari Weiss on account of any of the activities
described herein.

## EIGHTEENTH CLAIM FOR RELIEF

## N.Y. Gen. Business Law § 349(h)

### (All Defendants)

320.    The Trustee repeats and realleges each and every allegation contained in the

preceding paragraphs as if fully set forth again herein.

321.    Defendants' conduct described herein which deceived the Bankruptcy Court, the

Debtors, the Debtors' creditors and the DOH is symptomatic of a course of deceptive acts and

practices in the conduct of their businesses which is directed at the DOH and the public

generally.

322.    The Debtors and their estates have sustained actual damages by reason of

Defendants' deceptive acts and practices in an amount to be determined after trial.

323.    In addition, Defendants' conduct has demonstrated the high degree of moral turpitude, wanton dishonesty, and has been directed at the Bankruptcy Court, the DOH and the public at large, such that an award of punitive damages is also warranted in an amount to be determined after trial.

324.    The Trustee is further entitled to an award of the attorneys' fees incurred in bringing and prosecuting this proceeding pursuant to N.Y. Gen. Business Law § 349(h).

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in the Trustee's favor against the defendants to each claim for relief, in the amount requested by each claim for relief, plus attorneys' fees and costs, pre-judgment interest and punitive damages, where applicable, together such other and further relief as this Court deems just and proper.

Dated:  New York, New York
          August 30, 2013

**STORCH AMINI & MUNVES PC**
Special Counsel to Lori Lapin Jones, as Chapter 11 Trustee


By:      /s/ Bijan Amini
          Bijan Amini, Esq.
          Avery Samet, Esq.
          2 Grand Central Tower
          140 East 45th Street, 25th Floor
          New York, New York 10017
          Tel:  (212) 490-4100
          Fax: (212) 490-4208